## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

MULTIFEEDER TECHNOLOGY, INC.,
a Minnesota Corporation,

          Plaintiff/Counterclaim
          Defendant,

v.

BRITISH CONFECTIONERY
COMPANY LIMITED, a duly
incorporated under the laws of Province of
Newfoundland,

          Defendant/ Counterclaim
          Plaintiff,

AND

BRITISH CONFECTIONERY
COMPANY LIMITED, a duly
incorporated under the laws of Province of
Newfoundland,

          Third-Party Plaintiff,

v.

DOMINO PRINTING SOLUTIONS, INC.,

          Third-Party Defendant.

CIVIL NO. 09-1090 (JRT/TNL)

**REPORT
&
RECOMMENDATION**

---

William Christopher Penwell and Rachel L. Osband, **SIEGEL BRILL GREUPNER DUFFY & FOSTER, PA**, 100 Washington Avenue South, Suite 1300, Minneapolis, MN 55401; and Kristin L. Kingsbury, Gerald S. Duffy, and Michael R. Moline, **MONROE MOXNESS BERG, PA**, 8000 Norman Center Drive, Suite 1000, Minneapolis, MN 55437, for Multifeeder Technology, Inc.;

R. Christopher Sur and Paul B. Civello, **MASLON EDELMAN BORMAN & BRAND, LLP**, 90 South 7th Street, Suite 3300, Minneapolis, MN 55402, for British Confectionery Company Limited; and

Emily E. Duke, Cynthia A. Moyer and Sarah C. S. McLaren, **FREDRIKSON & BYRON, PA**, 200 South 6th Street, Suite 4000, Minneapolis, MN 55402-1425, for Domino Printing Solutions.

# I.

Almost three years ago this case began as a commercial dispute. In the last year and a half this case has devolved into an interminable and costly discovery maelstrom. The purpose of this Report and Recommendation is to bring some closure to this discovery odyssey.

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Multifeeder Technology Inc.'s (Second) Motion for Sanctions (Docket No. 104). British Confectionery Limited opposes the motion. The Court heard arguments on March 8, 2012. Gerald S. Duffy appeared on behalf of Multifeeder Technology, Inc. Christopher Sur appeared on behalf of British Confectionery Limited. Sarah McLaren appeared on behalf of Domino Printing Solutions, Inc., which takes no position on the motion. Also before the Court is British Confectionery Limited's Objection to the Unsealing of the Compact Disc Accompanying Attachment # 4 (Docket No. 144).

Based upon the record, memoranda, and arguments of counsel, the Court issues the following proposed findings and **RECOMMENDS** that Plaintiff's (Second) Motion for Sanctions (Docket No. 104) be **GRANTED IN PART** and **DENIED IN PART** as set forth herein, and British Confectionery Limited's Objection to the Unsealing of the

Compact Disc Accompanying Attachment #4 (Docket No. 144) be **OVERRULED AS MOOT**.

## II.

Based upon the record, including the file and documents contained therein, the undersigned Magistrate Judge proposes the following:

### FINDINGS

**A.    Underlying Lawsuit**

Plaintiff Multifeeder Technology, Inc. (Multifeeder) is a Minnesota corporation with its principal place of business in St. Paul, Minnesota. Compl., at ¶ 1, May 8, 2009 (Docket No. 1); Answer & Countercl., at ¶ 2, Jan. 6, 2010 (Docket No. 27). Multifeeder is in the business of designing and manufacturing systems used for the packaging, printing and mailing industries. *Id*.

Defendant and Third-Party Plaintiff British Confectionery Company Limited (British) is a Canadian corporation with its principal place of business in Newfoundland. Compl., at ¶ 2; Answer & Countercl., at ¶ 1. British is in the business of printing break-open lottery and pull-tab tickets. *Id*. "Provincial lottery corporations, and in particular, the Atlantic Lottery Corporation [(ALC)], are the most significant customers for British's break-open lottery tickets." Answer & Countercl., at ¶ 4. ALC is a Canadian corporation located in St. John's, Newfoundland and Labrador. Req. for Int'l Judicial Assist., at 4, (D. Minn. Jan. 5, 2011) (Docket No. 62).

Third-Party Defendant Domino Printing Solutions, Inc. (Domino) is a Canadian corporation with its principal place of business in Ontario. Am. 3rd-Party Compl., at ¶ 2, Aug. 23, 2010 (Docket No. 50). Domino is in the business of creating coding and printing components for variable data, such as bar codes. *Id.* at ¶ 2.

In May 2009, Multifeeder commenced this action against British. *See generally* Compl., May 8, 2009. British filed its Answer and Counterclaim against Multifeeder and a third-party complaint (Docket Nos. 32, 50) against Domino.[1] The parties' allegations can be summarized as follows: In June 2008, British requested that Multifeeder submit a proposal for the design and construction of a system capable of printing two-sided, break-open lottery tickets. Compl., at ¶ 7; Answer & Countercl., at ¶ 7; Am. 3rd-Party Compl., at ¶ 4. The parties understood that Multifeeder's system would need to work with Domino's printing components. Answer & Countercl., at ¶ 7; Am. 3rd-Party Compl., at ¶¶ 6-7. After exchanging multiple proposals, *see* Compl. at ¶¶ 8-9, Answer & Countercl., at ¶¶ 10-11, 15, and Am. 3rd-Party Compl., at ¶¶ 9-10, in September 2008, British and Multifeeder entered into an agreement. Compl., at ¶¶ 9-10; Am. 3rd-Party Compl., at ¶ 10. Thereafter, Multifeeder began to develop the system at its Minnesota facilities. *Id.* at ¶ 13. In February or March 2009, representatives of British visited Multifeeder's facilities to assess the performance testing that Multifeeder was doing with the system.

---

[1] The initial Third-Party Complaint (Docket No. 32) named "Domino Amjet, Inc., a Nevada corporation" as the third-party defendant. The parties stipulated that Domino Amjet, Inc. had no contact with British concerning this matter and, therefore, Domino would be substituted for Domino Amjet, Inc. as the third-party defendant. Stip. Substitute 3rd-Party Def., at 2, June 17, 2010 (Docket No. 43); *see also* Order (D. Minn. July 6, 2010) (Docket No. 44).

Answer & Countercl., at ¶ 26; Am. 3rd-Party Compl., at ¶ 18.  At some point in February or March 2009, British determined that Multifeeder's system and Domino's components did not function together to produce two-sided, break-open lottery tickets at the rate expected by British.  Answer & Countercl., at ¶¶ 21, 26; Am. 3rd-Party Compl., at ¶¶ 19-22.  Thereafter, in March 2009, British notified Multifeeder that it was in default under agreement and, in April 2009, British cancelled its purchase of the system from Multifeeder.  Compl., at ¶¶ 18-19; Answer & Countercl., at ¶¶ 28-30; Am. 3rd-Party Compl., at ¶¶ 19-22.  After terminating its agreement with Multifeeder, British contracted with BF Consulting to develop a replacement system.  British Mem., at 7, Mar. 16, 2011 (Docket No. 72).

Based upon the above allegations, Multifeeder asserts claims of breach of contract, breach of implied contract, and remedies pursuant to the agreement's terms.  *See* Compl., at ¶¶ 21-39.   Multifeeder initially sought damages from British in the amount of $633,428.12 plus unspecified "additional project costs" and "storage costs."[2]  Compl., at ¶ 40.  In turn, British asserts counterclaims against Multifeeder for breach of contract and unjust enrichment, and British seeks damages in the amount of $434,196.62.  Answer & Countercl., at ¶¶ 36-44.  British also brought a Third-Party Complaint against Domino, asserting claims of indemnity and contribution.  Am. 3rd-Party Compl., at ¶¶ 26-35.

---

[2] Multifeeder now asserts itemized damages of not less than $2,337,037.00. Aff. Neal Nordling, at ¶ 17, Sept. 30, 2011 (Docket No. 108).

### B.      Multifeeder's Motion to Compel

In August 2010, Multifeeder brought a Motion to Compel (Docket No. 45), seeking an order compelling British to produce responses to document requests. Multifeeder asserted that British failed to produce documents responsive to the following requests:

> **Document Request No. 31:** All documents, correspondence or communications with the [ALC],[3] charities or provincial lottery corporations, or related party or entity relating to the Project.
>
> **Document Request No. 51:** All documents, reports, correspondence or communications relating to or comprising an evaluation report or other similar document following any testing of the Multifeeder System, including any report that may have been created by or provided to the [ALC], charities or provincial lottery corporations, or related party or entity.
>
> **Document Request No. 53:** All documents, correspondence or communications that comprise Your contract, agreement or other arrangement with the [ALC], charities or provincial lottery corporations, or related party or entity.

Multifeeder's Mem., at 5-6, Aug. 9, 2010 (Docket No. 47); *see also* Aff. Kingsbury, at Ex. H-I, Mar. 30, 2012 (Docket No. 145). Multifeeder argued that these requests sought relevant information because Multifeeder's contract with British stemmed from British's contract with ALC and, following the performance tests in February or March 2009, ALC acquired test samples from the system; therefore, Multifeeder argued that "[i]t is critical

---

[3] The original discovery requests used the name "Atlantic Gaming Commission." *See* Aff. Kingsbury, at Ex. H-I, Mar. 30, 2012.

to Multifeeder's proof that its System was able to perform that it receive . . . ALC's communication with British on the acceptability of the test samples." *Id.* at 5.

In support of its motion, Multifeeder included an e-mail from British's counsel, who stated as follows: (1) in terms of internal communications at British, "most . . . [internal] communications [at British] were oral, either in person or by telephone[; (2) a] search was conducted for e-mail messages and the few completely internal ones that were found have been produced[; (3) n]o paper internal communication, other than e-mail, was identified"; (4) in terms of "communications with ALC and ALC's response to the test samples, some letters with ALC [were disclosed previously; and (5) British] is checking to determine whether there was any written response to the submission of the test . . . ." Aff. Penwell, at Ex. H., Aug. 9, 2010 (Docket No. 48-1).

British filed no opposition to the motion. On September 1, 2010, the parties appeared for a hearing on the motion. At the hearing before the Honorable Arthur J. Boylan, United States Chief Magistrate Judge for the United States District Court for the District of Minnesota, British's counsel stated as follows: As to Document Request No. 31, British "produced an email chain . . . that's responsive . . . and that is the only thing [British] ha[s] discovered." Aff. Kingsbury, at Ex. M, Mar. 30, 2012. As to Document Request No. 51, British had "made a complete disclosure as far as [it] can determine." *Id.* As to Document Request No. 53, British agreed to provide responsive information when an individual returned from vacation. *Id.*

The following colloquy between Chief Magistrate Judge Boylan and counsel for British is also relevant:

> COURT: Ok. Is there any concern that the Court needs to address the protocols adopted by the defense in conducting the search or anything in that nature.
>
> COUNSEL: No. I don't believe so, Your Honor.  You know, if, certainly, if something comes to light . . . As I understand it, we have done a thorough search and that's all that we have unless it's been produced previously.
>
>             . . . .
>
> COURT: There is . . . also a request for all documents to include internal communications between and among British personnel and all physical files in the case, custody or control of British.
>
> COUNSEL: Yes. A thorough search has been done for those and all of those have been produced.
>
> COURT: Can you assure counsel and the Court that no documents are being withheld on the basis of privilege *or otherwise* except as provided in a privilege log?
>
> COUNSEL: Yes, Your Honor.  I can assure that.

*Id.* (emphasis added).

On September 2, 2010, the Court granted Multifeeder's Motion to Compel.  *See* Order (D. Minn. Sept. 2, 2010) (Docket No. 52).

### C.    Multifeeder's First Motion for Sanctions

On March 3, 2011, Multifeeder filed Motion for Sanctions for Violation of Discovery Order and/or Motion for Contempt and Motion to Modify the Scheduling Order (First Motion for Sanctions) (Docket No. 63), seeking an order sanctioning British for its violations of the September 2, 2010 Order.  In support of its motion, Multifeeder discussed the depositions of British employees Colin Walsh, Martin Walsh, Blair

Connolly, David Connolly, Sr., and David Connolly, Jr., which were taken in February 2011 in Newfoundland.  Aff. Penwell, at ¶ 6, Mar. 9, 2011 (Docket No. 67).

The recurrence of surnames in the deposition catalog is not a coincidence.  British is a family owned and operated company.  David Connolly, Sr., owns British.  David Connolly, Jr., is Director of Quality Assurance at British and son of David Connolly, Sr. Decl. David Connolly, Jr., at ¶ 1, Nov. 18, 2011 (Docket No. 113).  Blair Connolly is the Vice President of Sales and Marketing at British and also the son of David Connolly, Sr. Blair Connolly was personally involved in negotiating on behalf of British with Multifeeder's representatives, and in particular with Mark Nordling, for the design and manufacture by Multifeeder of a system for British.  Aff. Blair Connolly, at ¶¶ 1 and 3, June 15, 2009 (Docket No. 10); *see also* Aff. Mark Nordling, at ¶ 5, July 10, 2009 (Docket No. 15).  Multifeeder is also a family owned and operated company.  Mark Nordling is the Sector Applications Engineering Manager for Multifeeder, Aff. Mark Nordling, at ¶ 1, July 10, 2009, and the son of Neal Nordling, Multifeeder's President and Chief Executive Officer. Aff. Neal Nordling, ¶ 1, Sept. 30, 2011.

Multifeeder supported its First Motion for Sanctions with the testimony of David Connolly, Jr.  He testified about his efforts to search for electronic documents in response to Multifeeder's discovery requests.  *See generally* Aff. Kingsbury, at Ex. C, Mar. 9, 2011 (Dep. Connolly, Jr., Feb. 16, 2011) (Docket No. 68-2).  David Connolly, Jr., testified as follows: He limited his search for e-mail communications responsive to Multifeeder's discovery requests to e-mails relating to three individuals. Dep. Connolly, Jr., 134:9-135:7, Feb. 16, 2011.  He did not conduct a search for e-mails from ALC

9

personnel, *id.* at 135:20-21, or from his primary contact person at ALC. *Id.* at 136:2-9. He did not search for communications from Domino personnel, among others, *id.* at 135:13-136:12, and he did not search for internal communications with Blair Connolly, David Connolly, Sr., Colin Walsh, or Martin Walsh. *Id.* at 136:11-20. His involvement with the project between British and Multifeeder was limited after British signed the agreements with Domino and Multifeeder. *Id.* at 141:3-5. Nevertheless, his involvement consisted of being "copied on a lot of the e-mail correspondence and [he] sat in on a few of the conference calls." *Id.* at ¶ 141:3-11. He also had hard copies of files related to ALC and the bar coding project, including hard copies of e-mail communications and "original specs." *Id.* at 136:17-137:10.

Also in support of its First Motion for Sanctions, Multifeeder attached the Affidavit of Mark Lanterman, Chief Technology Officer of Computer Forensic Services, Inc. (CFS). Aff. Lanterman, at ¶ 1, Mar. 9, 2011 (Docket No. 69). Lanterman stated that based upon his review of the record, the search for electronic documents conducted by British was deficient because "searches were not conducted of all the custodians' computers, [the] searches run on each custodian's computer [were] different, no[] search was conducted on any British server, and the terms searched [were] not known with certainty." *Id.* at ¶ 17. Lanterman concluded that "the only way to reliably search for these documents is to systematically create forensic images of all relevant storage devices . . . ." and to search the "forensic images" for responsive documents. *Id.* at ¶ 18.

Also in support of its First Motion for Sanctions, Multifeeder noted that British represented that "it does not have in its possession information and communications from

ALC." Aff. Penwell, at ¶ 12, Mar. 9, 2011.   Multifeeder also noted that, as of March 2011, British had produced approximately 5,000 pages of documents in comparison to the 37,000 pages produced by Domino.   *Id.* at ¶ 11.

Based upon these submissions, Multifeeder argued that (1) British withheld documents responsive to Document Request Nos. 31, 51 and 53; (2) British likely withheld other categories of relevant documents; and (3) British failed to conduct "the most basic searches for responsive documents."   Multifeeder's Mem., at 6-7, Mar. 9, 2011 (Docket No. 66).   Based upon these contentions, Multifeeder sought sanctions and, the appointment—entirely at British's expense—of a computer forensic expert selected by Multifeeder to image and search British's computers for responsive documents.   *Id.* at 16.

British opposed the motion, arguing that, *while mistakes were made*, the sanctions and appointment of a computer forensic expert were unwarranted because British was correcting its mistakes and British had substantially complied with Multifeeder's discovery requests.[4]   British acknowledged the following deficiencies in its production[5]: (1) since Multifeeder filed its motion for sanctions, British conducted an additional

---

[4] Of note, British stated: "Although British has no theoretical objection to a forensics expert reviewing its computer files, Multifeeder has made no showing that the appointment of a computer forensics specialist is necessary and would be anything more than an unnecessary expenditure of funds."   British Mem., at 15, Mar. 16, 2011 (Docket No. 72).   British stated that there was no showing, in part, because "*there has been no allegation or even a suggestion of destruction of evidence in this case*."   *Id.* at 16 (emphasis added).

[5] Most of these deficiencies are also recited in the Declaration of Blair Connolly. *See generally* Decl. Blair Connolly, at ¶ 1 Mar. 16, 2011 (Docket No. 73).

search for documents or communications from ALC regarding the February and March 2009 samples and discovered previously undisclosed e-mails, British Mem., at 4, Mar. 16, 2011 (Docket No. 72); (2) Colin Walsh identified a previously undisclosed document with greater specificity such that it could be produced, *id.* at 5; (3) Blair Connolly failed to gather hard copies of documents that Multifeeder requested and these documents would be produced, *id.* at 6; (4) British conducted an additional search and British supplemented its document production with 19 e-mails the evening before the deposition of David Connolly, Sr., *id.* at 8; (5) "[w]ith respect to Colin Walsh, . . . British acknowledge[d] that it failed to conduct a search of Mr. Walsh's Outlook account," *id.* at 8; (6) "British acknowledge[d] that Dave Connolly Jr.'s search did not retrieve all responsive emails," *id.* at 10; and (7) Blair Connolly "did not in fact capture all responsive e-mails in Outlook sub-folders."[6] *Id.* at 10.

At the hearing on the motion, Chief Magistrate Judge Boylan questioned counsel for Multifeeder extensively about the cost of appointing a computer forensic expert to conduct an analysis of British's computers and the degree to which such costs are

---

[6] Blair Connolly averred as follows:

> [w]ith respect to the search of my e-mail account, I believed in good faith that, consistent with my usual record-keeping procedures, that I had filed all e-mails relating in any way to the bar-coding project in Outlook sub-folders. I further believed that, in so doing, I had captured all internal British e-mails relating to the bar-coding project. These beliefs resulted in British's representation in September of 2010 that all internal e-mails had been produced. I now have learned that my beliefs and this representation were mistaken.

Decl. Blair Connolly, at ¶ 16, Mar. 16, 2011.

proportionate with the claims within this litigation. *See* Hr. Tr. at 10:12-13:5 (Docket No. 148). During this colloquy, counsel for Multifeeder estimated the cost "in the range of $10,000 plus travel." *Id.* at 12:15-12:24. At the conclusion of the hearing, Chief Magistrate Judge Boylan requested that the parties file an electronically stored information (ESI) protocol and stated that "[a]bsent some agreement, I'm going to take it upon myself to issue an order that will establish a protocol and give you the appropriate search terms. And absent some agreement, I'll need you to supply me with your competing proposals." *Id.* at 34:18-24.

Thereafter, on March 25, 2011, Chief Magistrate Judge Boylan considered the file and documents contained therein, along with memoranda, affidavits, and arguments of counsel, and found, in part, as follows:

> . . . British did not accurately represent circumstances relating to discovery in connection with a previous motion to compel discovery filed by the plaintiff and has failed to fully comply with court's Order dated September 2, 2010, therein requiring production of responsive documents, and sanctions are therefore warranted. However, plaintiff has not persuasively shown that the defendant British was acting intentionally or in bad faith in regard to its discovery obligations, and the court therefore declines to find defendant British in contempt and declines to impose the severe sanction of dismissal of the counterclaim.

Order, at ¶ 2 (D. Minn. Mar. 25, 2011) (Docket No. 79). Based upon this finding, Chief Magistrate Judge Boylan ordered, in part, as follows:

> The parties shall meet and confer to discuss and prepare a stipulation for approval by the court for the purposes of establishing a protocol for remaining electronic discovery in this action. The stipulation shall be submitted to the court on or before April 8, 2011. In the event that the parties are

> unable to reach agreement/stipulation on electronic discovery,
> including assessment of costs, each party shall submit an
> independent proposal from which the court will construct an
> Order establishing an electronic discovery protocol and
> assessing costs for implementation of the protocol.

*Id.* at ¶ 5.

### D.    April 26, 2011 ESI Protocol Order

On April 14, 2011, Multifeeder filed Proposed Protocol to Collect Electronic

Discovery From British Confectionery Company Limited – Submitted By Multifeeder

Technology, Inc. (Docket No. 81).[7] Multifeeder proposed the appointment of CFS (and

Lanterman) to implement a search of British's computers, *id.* at at ¶ 1; Multifeeder

proposed certain procedures, custodians, and certain search terms, *id.* at ¶¶ 2-6; and

Multifeeder proposed as follows:

> [Multifeeder] has engaged CFS to assist Plaintiffs in the
> preservation, search and production of electronically stored
> information potentially relevant to the parties' claims.
> Multifeeder shall bear the costs of travel for CFS to
> Newfoundland (including airfare and hotel), and CFS's time
> for travel to Newfoundland at its hourly travel rate), and
> CFS's fees for searching the imaged Devices. British shall
> bear the costs of imaging including the technician's actual
> hourly rates at $275/hour (estimated to be 1-3 working days),
> the imaging fees per device which are: (a) $300 per
> laptop/desktop; (b) $500 per server drive if any; (c) $300-500
> per Blackberry; and (d) $2000 per iPhone, and CFS's time for
> travel returning to Minnesota at its hourly travel rate.
> Multifeeder reserves the right to later seek assessment of
> costs it incurs in connection with this Protocol.

*Id.* at ¶¶ 5-7.

---

[7] This document was mislabeled as a "Stipulation" on the docket.

In response, British sent Chief Magistrate Judge Boylan a letter (Docket No. 117-2) dated April 14, 2011, stating that British "recognize[d] that its original searches of its e-mail accounts were deficient" and it did "not object to the imaging of its computers," *id.* at 1; nevertheless, British objected to bearing the cost of imaging because "even assuming a very conservative travel and imaging costs, Multifeeder [sought] to impose upon British a minimum of approximately $12-13,000, although in reality this number could easily be far higher." *Id.* at 4. British proposed as an alternative that it be permitted to conduct its own "search for any e-mails between or among the five custodians from January 2008 through December 2009 with the [specified] search terms." *Id.* at 5.

Chief Magistrate Judge Boylan considered both submissions and, on April 26, 2011, entered Finding of Fact, Conclusions of Law, and Electronically Stored Information Search Protocol Order (ESI Protocol Order) (Docket No. 84). Chief Magistrate Judge Boylan found, in part, as follows:

> 7. The parties were unable to reach an agreement or stipulation regarding electronic discovery and both parties submitted proposals for the Court's review. The Court has reviewed the proposals. The parties' proposals contain the following areas of disagreement:
> a. Whether discovery by a third party is warranted;
> b. How the cost for electronic discovery shall be borne by the parties;
> c. The extent of electronic discovery; and
> d. The extent of the search parameters, including what keywords are to be used.
>
> 8. Multifeeder's proposal included the affidavit of Mark Lanterman of Computer Forensic Services, Inc. (CFS).

9. British Confectionery's proposal contained no expert affidavit, no substantive proposal for a third-party search, and no reasonable assurances as to how its proposed electronic search protocol would avoid the search deficiencies that led to the previous order of sanctions.

*Id.* at Findings of Fact ¶¶ 7-9. The ESI Protocol Order then describes the search of British's computers that would be undertaken by CFS. While every provision of the ESI Protocol Order is relevant to the present motion, the following provisions warrant particular attention:

1. Mark Lanterman and CFS (collectively hereafter referred to as CFS) shall be the only third-party expert to implement this protocol order.

a. From the date of this order, CFS shall be deemed a third-party expert and CFS shall cease all other work on behalf of either party unless expressly permitted by this order.

. . . .

2. British Confectionery shall provide CFS with reasonable access to its personnel and facilities so that CFS can implement this protocol.

3. The following individuals constitute custodians of relevant data (Custodians) with British Confectionery:
a. Blair Connolly
b. Colin Walsh
c. David Connolly, Jr.
d. David Connolly, Sr.
e. Terry Reardon

. . . .

10. Following "recreation" of each Custodian's personal computer(s), CFS shall undertake the following procedure:

a. CFS shall perform an electronic search of each Custodian's personal computer(s) to locate relevant documents.

b. . . . CFS will prepare a detailed log. The detailed log will contain a list of all relevant documents on each personal computer and state the document's file name, file extension, the size of the file, and the location of the file on the hard drive, and the date and time when the file was created, last accessed, and last altered.

c. CFS shall provide a copy of the detailed log to the Court under seal by mailing said copy to [the Court].

. . . .

12. Multifeeder shall bear the following costs related to the implementation of this order:

a. CFS's travel costs, including airfare and accommodations.

b. CFS's fees for searching the "recreations" of each Custodian's personal computer(s) and creating the detailed log and copies of relevant documents.

c. All costs reasonably incurred by CFS in the implementation of this protocol that have not otherwise been designated as the responsibility of British Confectionery.

13. British Confectionery shall bear the following costs related to the implementation of this order:

a. CFS's time for travel, at CFS's hourly rate of $275/hour.

[b.] CFS's hourly rate—$275/hour—to create the accurate representations of the personal computers. British Confectionery shall not bear the cost of more than 24 personnel work hours used in creating the accurate representations of the personal computers.

[c.] CFS's per device fee of $300 per personal computer and $500 per server drive.

*Id.*

There was no objection to Chief Magistrate Judge Boylan's ESI Protocol Order. Shortly after the entry of the ESI Protocol Order, this case was reassigned to the undersigned magistrate judge.

On June 15, 2011, the parties filed Stipulation to Amend the Scheduling Order (Docket No. 86). The parties stated that CFS had traveled to British's facility to image the devices. *Id.* at ¶ 1. The parties also stated:

> [D]uring CFS's visit to British's facility, British produced additional devices for imaging that were not previously made known to CFS or the parties. Thus, the quantity of devices CFS imaged and the amount of data CFS retrieved exceeded expectations. CFS has represented it will be unable to complete its obligations under the Electronic Discovery Order by its deadline of June 25, 2011.

*Id.* at ¶ 3. For this and other reasons, the parties requested that the pretrial scheduling order be amended. The motion was granted. *See* Fourth Am. Pretrial Scheduling Ord. (D. Minn. June 17, 2011) (Docket No. 87).

### E.    CFS's Analysis

Subsequently, Lanterman contacted chambers and reported that he discovered evidence "that certain files were purged or deleted shortly before he arrived" at British's facility.  Order Opinion (D. Minn. June 20, 2011) (Docket No. 88).  Thereafter, the Court directed CFS to create a log detailing those documents that CFS believed are relevant and were deleted between October 1, 2007, and the time CFS arrived to image the computers. *Id.* CFS was directed to provide the Court with a copy of the logs on or before August 12, 2011. *See* Order (D. Minn. Aug. 10, 2011) (Docket No. 94). On August 10, 2011,

Lanterman provided the Court with a Forensic Services Report (FSR) (Docket No. 142, Attachment # 4).[8]

The FSR outlines the timeline of events:  On May 24, 2011, CFS arrived at British's facility in Newfoundland to image 12 hard drives.  FSR, at 2-4. CFS imaged four hard drives each day on May 24, 25, and 26.  *Id.*  Of particular relevance to the present motion, CFS imaged the following hard drives with numerical designations assigned by CFS: David Connolly, Sr.'s Desktop (005); Terry Reardon's Old HP Desktop (006); Terry Reardon's HP Desktop (008); Blair Connolly's Data External (or External Hard Drive) (009); Blair Connolly's HP Laptop (010); David Connolly, Jr.'s Laptop (011); and Blair Connolly's New HP Laptop (012).  *Id.* at 2-4.  After imaging the hard drives, CFS began analyzing the hard drives and discovered what it believed was the "intentional destruction of data," including the use of commercial wiping software on David Connolly, Jr.'s Laptop; the deletion of PST files from Blair Connolly's computers; and the reformatting of various hard drives.  *Id.* at 5-6.

Based upon CFS's allegations, Multifeeder brought the present motion, which British opposes. British offers the testimony and declarations of Wade Chafe, an information technology security specialist with EWA-Canada Limited, to rebut the

---

[8] The FSR consists of a 17-page written report and a compact disc containing the logs required by the ESI Protocol Order, as amended by the Fourth Amended Pretrial Scheduling Order, and the Order Opinion. Order (D. Minn. Aug. 23, 2011) (Docket No. 96). The FSR that the Court filed on March 26, 2012, *see* Docket No. 142, Attachment # 4, does not include the compact disc. The Court has not considered the compact disc for the purposes of the present motion because Multifeeder has not seen the compact disc and British has not had an opportunity to raise objections, if any.

allegations of CFS. *See* Decl. Chafe, at Ex. A, Nov. 18, 2011 (Docket No. 116) (Chafe's resume).

The Court will consider each of CFS's allegations in turn. The Court will address its credibility determinations in Section III of this Report and Recommendation.

### 1. Dave Connolly, Jr.'s Laptop

Three commercial wiping software applications[9] were found on David Connolly, Jr.'s Laptop 011: *CCleaner*, *PGP Desktop*, and *Spybot Search and Destroy*. FSR, at 5; Decl. Chafe, at ¶ 7, Nov. 18, 2011. *CCleaner* was installed most recently on March 30, 2011. Supp. FSR, at 5, Feb. 16, 2012 (Docket No. 142, Attachment # 15); Decl. Chafe, at ¶ 9, Nov. 18, 2011; Decl. Chafe, at ¶ 2, Mar. 2, 2012 (Docket No. 133). *CCleaner* and *Spybot Search and Destroy* were "used" or "executed" multiple times during the course of this litigation. Supp. FSR, at 6-7; Decl. Chafe at ¶ 2, Mar. 2, 2012. *CCleaner* was last "accessed on 5/25 at 8:20PM."[10] FSR, at 5. While it cannot be determined whether *CCleaner* and *Spybot Search and Destroy* were used to destroy any data on Laptop 011, *CCleaner* can be used to destroy data without creating a record that it destroyed data. Supp. FSR, at 6; Decl. Chafe, at ¶ 2, Mar. 2, 2012.

---

[9] "Commercial wiping applications are programs created to assist users in removing data related to file access and Internet activity and also allow users to permanently delete unwanted data files. Since applications permanently overwrite data, recovery of file content is often impossible." FSR, at 5.

[10] During his deposition, Lanterman testified that someone used *CCleaner* on May 25, 2011, to "deliberately destroy[] data." Dep. Lanterman, 123:21-124:3, Feb. 17, 2012.

*PGP Desktop* was installed on October 21, 2010. Decl. Chafe, at ¶ 8, Nov. 18, 2011.  Six deletions from Laptop 011 using *PGP Desktop* have been identified.[11]  Chafe identified a 14.4 MB file and a 3.8 MB file that were both "wiped" using *PGP Desktop* on May 20, 2011, at 2:55 p.m.  Decl. Chafe, at ¶ 8, Nov. 18, 2011.  Four additional files, each exactly 4096 bytes in size, were also deleted.  Supp. FSR, at 7; Dec. Chafe, at ¶ 3, Mar. 2, 2012.  These files were wiped during "two separate occasions in mid-May," when the "recycling folder" was overwritten using *PGP Desktop*.  Decl. Chafe, at ¶ 3, Mar. 2, 2012. The experts agree that the contents of the deleted files cannot be confirmed.  FSR, at 5; Supp. FSR, at 7.

David Connolly, Jr., avers that *PGP Desktop* was installed on his Laptop 011 because ALC "require[d] that [he] encrypt certain confidential lottery files before sending them" and *PGP Desktop* includes encryption software.  Decl. David Connolly, Jr., at ¶ 3, Mar. 2, 2012 (Docket No. 131).  David Connolly, Jr., also avers that when he "learned that [his] laptop was going to be imaged, [he] remembered that there were one or two adult movies contained [on his] hard drive. In a misguided effort to avoid embarrassment,

---

[11] Under the heading "*CCleaner*," Mark Lanterman states: "Information contained within recovered Prefetch files reveals that [*PGP Desktop*, *CCleaner*, and *Spybot Search and Destroy*] were executed no less than 22 times" on Laptop 011. Supp. FSR, at 6. Chafe notes this statement and states that Prefetch files are an imperfect indicator of whether *PGP Desktop* was executed and he provides a cogent explanation of why Prefetch files are not definitive indicators that *PGP Desktop* was used to destroy data. Decl Chafe, at ¶ 2, Mar. 2, 2012.  David Connolly, Jr., avers that on some dates when the Prefetch files indicate that *PGP Desktop* was executed he was out of the office and did not have access to his laptop.  Decl. David Connolly, Jr., at ¶ 3, Mar. 2, 2012.  While this is consistent with Chafe's declaration, the Court does not read Chafe's declaration to support that Prefetch are imperfect for determining whether or not *CCleaner* and *Spybot Search and Destroy* were run. As stated above, there is no dispute that these programs were "used" or "executed" on numerous occasions.

[he] utilized the PGP 'shredder' program to delete these programs." Decl. David Connolly, Jr., at ¶ 3, Nov. 18, 2011; *see also* Decl. David Connolly, Jr., at ¶ 4, Mar. 2, 2012. David Connolly, Jr., avers that, while he is aware *CCleaner* was installed on his Laptop 011, he has "no recollection of ever using the memory wiping application or any other *CCleaner* application to delete or overwrite any files." *Id.* For these and the reasons set forth in Section III of this Report and Recommendation below, the Court does not find persuasive David Connolly, Jr.'s explanations concerning the deleted files and, instead, finds that British intentionally destroyed evidence after commencement of this lawsuit to the prejudice of Multifeeder.

### 2. PST File Deletions from Blair Connolly's Computers

Blair Connolly had ESI on three different hard drives: Blair Connolly's External Hard Drive 009, Blair Connolly's HP Laptop (Old Laptop 010), and Blair Connolly's New HP Laptop (New Laptop 012). In December 2010, British purchased a new laptop for Blair Connolly—New Laptop 012. Decl. Connolly, at ¶ 2, Nov. 18, 2011 (Docket No. 112). Blair Connolly transitioned from his Old Laptop 010 to his New Laptop 012 over a two-month period. Decl. Blair Connolly, at ¶ 2, Nov. 18, 2011. British employee Steve Holden was instructed to copy "everything from [Old Laptop 010] and store it on one of British's servers." *Id.* A folder on British's "Panther" server, created on January 21, 2011, contains the e-mails from Blair Connolly's Old Laptop 010. *Id.*

In April 2011, Colin Walsh copied Blair Connolly's "complete user folder," Decl. Colin Walsh, at ¶ 2, Nov. 18, 2011 (Docket No. 115), including Microsoft Outlook PST

files, from Old Laptop 010 to an external hard drive.  Decl. Blair Connolly, at ¶ 3, Nov. 18, 2011.  A PST is a type of file that "stores data related to emails, contacts, appointments, tasks and notes."  Supp. FSR, at 2.  The copied PST files were uploaded to Colin Walsh's computer and then to British's server.  Decl. Blair Connolly, at ¶ 3, Nov. 18, 2011; Decl. Colin Walsh, at ¶ 2, Nov. 18, 2011.

The experts do not dispute that there is evidence on Blair Connolly's Old Laptop 010 of two deletions that occurred on April 28, 2011. FSR, at 6; Supp. FSR, at 7. The first was the deletion of confirmed pornographic material.  Supp. FSR, at 7; *see also* Dep. Lanterman, 115:2-19, Feb. 17, 2012.  The second session "involved the use of at least one wiping program."  Supp. FSR, at 7.  "CFS found evidence of the installation and use of *CCleaner* and *SpyBot Search and Destroy*." Supp. FSR, at 7. The experts also do not dispute that the e-mail archive on Blair Connolly's New Laptop 012 was created on March 14, 2011, which is almost four months after the drive manufacturer date of the New Laptop 012 and three months after the first user activity. FSR, at 7.

The experts dispute whether PST files were deleted from Blair Connolly's New Laptop 012.  Blair Connolly contends that he did not delete any PST files on or around May 5, 2011, and if any files were deleted from his New Laptop 012, then a copy of the files can also be found on British's server. Decl. Connolly, at ¶ 4, Nov. 18, 2011.

CFS found that on May 5, 2011—some two years after this litigation commenced and in the same month that CFS was to arrive in Newfoundland to fulfill the ESI Protocol Order issued ten days earlier—two PST files, totaling 14 gigabytes, or approximately 1.4 million printed pages, were "deleted, overwritten and [made] unrecoverable" from Blair

Connolly's New Laptop 012. FSR, at 5-6. The files were "British Groups.pst," which was approximately 12.6 gigabytes, and "Personal Folders.pst," which was approximately 1.3 gigabytes. Supp. FSR, at 7.

Chafe was unable to find any evidence on Blair Connolly's New Laptop 012 that two PST files totaling 14 gigabytes were "deleted, overwritten and [made] unrecoverable." Decl. Chafe at ¶ 5, Nov. 18, 2011; Decl. Chafe, at ¶ 4, Mar. 2, 2012. Chafe, however, found the following PST files on the New Laptop 012: "X:\Mail\archive.pst" and "X:\Mail\Personal Folders.pst." Decl. Chafe, at ¶ 5, Nov. 18, 2011. The "X: drive," on which Chafe found these PST files, was an encrypted volume, which was created on December 14, 2010. Decl. Chafe, at ¶ 6, Nov. 18, 2011. The PST files were copied to the encrypted volume on January 21, 2011, and last used May 25, 2011. Decl. Chafe, at ¶ 6, Nov. 18, 2011. Chafe contends that the two files correspond with deleted files from the unencrypted volume of Blair Connolly's Laptop 012[12] and an external hard drive that was delivered to him for analysis. Decl. Chafe, at ¶ 5, Nov. 18, 2011.

CFS did not have access to the "X: drive" encrypted volume when it conducted its initial analysis because its very encryption obfuscated it from CFS's "view." Supp. FSR, at 3-4. In January 2012, CFS obtained a password from British in order to examine the volume. *Id.* CFS subsequently examined the encrypted volume and reexamined the

---

[12] Apparently, Chafe reviewed Blair Connolly's actual Old Laptop 010 rather than the image of the Old Laptop 010 created by CFS. Supp. FSR, at 7. Therefore, the experts did not necessarily review the same content. Supp. FSR, at 7.

unencrypted volumes on the Old Laptop 010, New Laptop 012, and British's server. *Id.* at 3. Based upon this analysis, CFS disputes Chafe's conclusion that the "British Group.pst" file in the encrypted volume is the same file as the deleted "British Group.pst" file from the unencrypted volume because the encrypted volume's file is 350 megabytes bigger than the file that was deleted from the unencrypted volume. Supp. FSR, at 3. Furthermore, "British Group.pst" is not found on the Old Laptop 010. Supp. FSR, at 3. Blair Connolly states that "British Group.pst" on New Laptop 012 was created in January 2011 and it only contains e-mails from that date forward. Decl. Blair Connolly, at ¶ 1, Mar. 8, 2012 (Docket No. 138).

As stated above, an additional external hard drive was "discovered" after briefing on the (Second) Motion for Sanctions commenced. Supp. FSR, at 1-2. In May 2011, David Connolly, Jr., turned over another external hard drive to CFS to be imaged. David Connolly, Jr. ¶ 5, Nov. 18, 2011. He believed that it contained back-up information for some of Blair Connolly's files. *Id.* He later found "the correct external hard drive" in Colin Walsh's office, which was immediately sent to British's counsel. *Id.* This additional external hard drive was reviewed by Chafe and, according to Chafe, it contains "archive.pst" and "Personal Folders.pst," which together total approximately 14 gigabytes. Supp. FSR, at 1-2. CFS did not have the opportunity to review this additional hard drive. Supp. FSR, at 2.

### 3.     Reformatting

CFS reported that there was "reformatting" of multiple British hard drives. FSR, at 5, 9. "Reformatting is a process by which all data stored on a device is deleted en masse." FRS, at 5. CFS also found evidence that the e-mail archives found on some of the systems were created after the dates specified in the ESI Protocol Order, which suggests to CFS that the records recovered are not the originals. FSR, at 6-7.

CFS identified reformatting on three devices: Blair Connolly's External Hard Drive 009 was reformatted on August 25, 2010. FSR, at 6. David Connolly, Jr.'s New Laptop 011 was reformatted on August 31, and September 1, 2010, using a wiping application. FSR, at 6. Terry Reardon's Old HP Desktop 006 was reformatted and a new operating system was installed sometime in May 2011.[13] FSR, at 6.

David Connolly, Jr., avers as follows:

> In late August 2010, the hard drive on [his] laptop failed. On August 26, 2010, [he] sent the disabled laptop and a portable hard drive to a local vendor . . . to recover whatever could be saved from the laptop hard drive and save this information on the portable hard drive. Invoices from [the local vendor] confirm that data was recovered, and [the local vendor] provide [him] with a loaner hard drive. Windows was then reinstalled on the loaner hard drive, and files that had been recovered were transferred from the portable hard drive to the laptop.

David Connolly, Jr., at ¶ 2, Nov. 18, 2011.

Terry Reardon avers that, in late 2010, he got a new desktop computer. Decl. Reardon, at ¶ 2, Nov. 18, 2011. He temporarily used both his old and new desktop

---

[13] The FSR states that the reformatting happened on May 21, 2011, and May 12, 2011. *Compare* FSR, at 5 *with* FSR, at 9.

computers, saving "almost all [of his] files on servers and not the desktop." *Id.* After he

ceased using his old desktop in early 2011, Steve Holden reformatted the old desktop for

use in the printing plant. *Id.* Terry Reardon further avers that:

> By this time, however, all of [his] file data that was stored on
> the [old] desktop computer, and not on a server, had already
> been moved to my new desktop. [He] did not delete any file
> data as part of the process of transitioning to the new desktop
> computer. The servers and the new desktop have been imaged
> by CFS.

*Id.*

In addition to reformatting, CFS found evidence that the e-mail archives' first user

activity dates do not correspond with the drive manufacturer dates for the following

devices:  David Connolly, Sr.'s Desktop (005) has a manufacturer date of November

2006 and the date of first user activity was September 23, 2005. FSR, at 7. Terry

Reardon's Old HP (006) has a manufacturer date of October 8, 2004, and the date of first

user activity was May 12, 2011.  *Id.*  Colin Walsh's HP Desktop (007) has a

manufacturer date of October 10, 2008, and the date of first user activity was December

3, 2008.  *Id.*  Terry Readon's HP (008) has a manufacturer date of August 2009 and the

date of first user activity was December 15, 2010.  *Id.*  Blair Connolly's External Hard

Drive (009) has a manufacturer date of October 2006 and the date of first user activity

was August 25, 2010. *Id.* Blair Connolly's HP Laptop (010) has a manufacturer date of

April 2008 and the date of first user activity was June 1, 2008.  *Id.* David Connolly, Jr.'s

Laptop (011) has a manufacturing date of October 2009 and the date of first user activity

was September 1, 2010.  *Id.*  Blair Connolly's HP Laptop (012) has a manufacturer date

of November 2010 and the date of first user activity was December 13, 2010. *Id.* CFS contends that these discrepancies indicate that "most of the metadata . . . present on the systems were too recent to have been original to the dates specified in the ESI Order of April 26, 2011." *Id.* at 6.

### F.    CFS's Invoices

CFS had an Engagement Agreement (Docket No. 142, Attachment # 6) with Multifeeder prior to the ESI Protocol Order.  The Engagement Agreement described and set rates for imaging, onsite, data analysis and consultation, expert witness, and data storage services.  *Id.*  This Engagement Agreement was not provided to Chief Magistrate Judge Boylan prior to the issuance of the ESI Protocol Order.

Lanterman contacted chambers on August 1, 2011 (Docket No. 142, Attachment # 1), "to notify the Court that while [CFS's] search and analysis is (sic) completed, CFS has outstanding invoices that have not been satisfied."  Order to Show Cause (D. Minn. Aug. 2, 2011) (Docket No. 90).  Lanterman stated: "[CFS's] contractual relationship with Plaintiff's counsel requires payment prior to the release of data" as required by the Court's June 17, 2011 Order. *Id.*

On August 2, 2011, the Court issued an Order to Show Cause directing Multifeeder and British to show cause why each "is not in violation of the [ESI] Protocol Order for not paying CFS as required by the Order." *Id.*  After a telephone conference with the parties, the Court ordered Multifeeder and British each to pay $25,000 to CFS. Order (D. Minn. Aug. 10, 2011) (Docket No. 94).

On September 8, 2011, the parties wrote to the Court because counsel for Multifeeder received a letter from CFS indicating that "if payment is not received by CFS by September 27, 2011, CFS [would] withdraw from its engagement and purge all data from its servers." Letter, Sept. 13, 2011 (Docket No. 101); *see also* Docket No. 142, Attachment # 7. The parties noted that "destruction or purging of this data [would] hinder the parties' adherence to the Court's Orders." *Id.* Thereafter, the Court ordered that "[n]either Mark Lanterman nor Computer Forensic Services, Inc., shall erase, purge, or destroy any data, work product, or property that was created or obtained in connection with this case." Order Opinion (D. Minn. Sept. 14, 2011) (Docket No. 102).

On October 18, 2011, British wrote to the Court that it was having difficulty obtaining copies of some of the imaged devices from CFS because CFS was engaged in other projects. *See* Docket No. 142, Attachment # 9. On October 28, 2011, British wrote to the Court that it had not received copies of two imaged devices that British requested from CFS. *See id.* at Attachment # 10. On November 2, 2011, Multifeeder wrote to the Court stating that it "continue[d] to receive ongoing invoicing from CFS as to accruing interest and late charges." *See id.* at Attachment # 11.

On January 16, 2012, the parties wrote to the Court regarding the deposition of Lanterman. *See id.* at Attachment # 14. The parties reported to the Court that Lanterman told the parties that he needed to review additional information and files in advance of his deposition and reported that he needed 30 to 50 hours to prepare for his deposition. *See id.* at Attachment # 14. Lanterman "submitted an invoice to the parties for approximately $25,000 and stated that he would not begin his preparation until he received the full

amount." *See id.* at Attachment # 14.   Thereafter, the Court limited Lanterman's expert deposition fees to $12,000 and directed British and Multifeeder each to pay $6,000 of the expert deposition fees. *See* Order (D. Minn. Jan. 24, 2012) (Docket No. 125).

The Court also directed CFS to deliver to the Court a detailed description of work performed and a detailed accounting for all outstanding invoices.   *Id.*   Pursuant to that Order, CFS sent the Court its invoices. *See* Docket No. 142; *see also infra* n. 14-18. The parties also submitted summaries of the amounts paid to CFS and the amounts still due. *Id.*

Prior to entry of the ESI Protocol Order, Multifeeder had satisfied three CFS invoices totaling $4,100.[14] After entry of the ESI Protocol Order, Multifeeder satisfied four invoices totaling $177,159.46.[15] After entry of the ESI Protocol Order, British satisfied two invoices totaling $3,558.[16] All of the paid invoices after the ESI Protocol Order total $181,259.46.

There are currently 12 unpaid invoices that were submitted to Multifeeder by CFS following the ESI Protocol Order.[17] Six of these invoices, totaling $51,720.00, are for "data storage" for the months July 2011 through February 2012.[18] Invoice #3836

---

[14] *See* Invoices #3716, #3730, and #3742.

[15] *See* Invoices #3764, #3783, #3783, and #3814.

[16] *See* Invoices #3895 and #3898.

[17] *See* Invoices #3836, #3836a, #3845, #3845a, #3872, #3872a, #3993, #3961, #3919, #3896, #3877, and #3859.

[18] *See* Invoices #3993, #3961, #3919, #3896, #3877, and #3859.

constitutes 529.5 hours of "analysis" and 36.75 hours of "submittal preparation," totaling $149,943.75. Invoice #3836a constitutes $16,940.38 in late payment fees on Invoice #3836. Invoice #3845 constitutes 89.25 hours of "analysis," 57 hours of "documentation," and 45.5 hours of "submittal preparation" as well as costs incurred in purchasing an external hard drive, printing, and courier services, totaling $61,585.25. Invoice #3845a constitutes $6,957.79 in late payment fees on Invoice #3845. Invoice #3872 constitutes expenses incurred in document review, communicating with counsel, and printing and shipping, totaling $1,612.50. Invoice #3872a constitutes $150.44 in late payment fees on Invoice #3872. All of the unpaid invoices total $288,910.12.

### G.    Other Relevant Discovery

In March 2010, Multifeeder served British with Interrogatories (Set I), Request for Production of Documents (Set I), and Request for Production of Documents (Set II). Aff. Kingsbury, Ex. G-I, Mar. 30, 2012.   In addition to the depositions in Newfoundland discussed above, the parties have also conducted eight other depositions related to general discovery, and two expert depositions related to the issue of spoliation.   Aff. Kingsbury, at ¶ 5, Mar. 30, 2012.  *Id.*

In November 2010, Multifeeder brought a Motion for Issuance of Letters Rogatory (Docket No. 55).  Multifeeder sought the Issuance of Letters Rogatory in order to compel ALC to produce certain information relevant to this action. This information included the ALC or British specifications for the system.  This information also included whether the preliminary testing done in February 2009 demonstrated that the system could function in

the manner promised by Multifeeder or required by British and ALC. The Honorable John R. Tunheim, United States District Court Judge for the District of Minnesota, granted Multifeeder's motion and issued Request for International Judicial Assistance (Letters Rogatory).

On March 9, 2011, a hearing was held in the Supreme Court of Newfoundland and Labrador before the Honourable Mr. Justice Robert M. Hall. *See* Aff. Kingsbury, at Ex. C-D, Mar. 30, 2012. The Supreme Court of Newfoundland and Labrador concluded that, with the exception of three requests, all other Document Requests were relevant and their production was ordered. *Id.* Pursuant to the Court's order staying discovery, *see* Order (D. Minn. Sept. 7, 2011) (Docket No. 99), Multifeeder has not sought discovery from ALC under the Letters Rogatory. Aff. Kingsbury, at ¶ 6, Mar. 30, 2012.

In September 2011, the parties expressed an interest in engaging in settlement discussions and motion practice regarding spoliation. For these reasons and because of the outstanding invoices from CFS, the Court stayed discovery. *See* Order (D. Minn. Sept. 7, 2011). Discovery has been stayed since that time.

### H.    Multifeeder's Litigation Expenses

As of the filing date for the (Second) Motion for Sanctions, Multifeeder had incurred $412,419.48 in legal fees from four different law firms related to this litigation; $7,890.50 in travel expenses for depositions; $2,398.26 on photocopying; and $13,256.17 in court reporter expenses. Aff. Neal Nordling, ¶ 17, Sept. 30, 2011. As of March 1, 2012, Multifeeder had incurred an additional $22,129.27 in legal fees; $714.80 in court

report expenses; and $194.36 additional expenses. Aff. Kingsbury, at ¶ 17. Mar. 1, 2012

(Docket No. 128).

### III.

Based upon the foregoing proposed Findings, the undersigned Magistrate Judge

makes the following:

### CONCLUSIONS OF LAW

#### A.   Multifeeder's Motion to Disqualify British's Expert

Multifeeder moves for disqualification of British's expert because "Chafe is not

qualified to testify before this Court." Pl.'s Supp. Mem. at 2, Mar. 1, 2012 (Docket No.

127). Multifeeder's motion is based entirely on the fact that Chafe has no educational

experience in "the field of computer forensics." Pl.'s Supp. Mem. at 18-19, Mar. 1, 2012.

Because Chafe's competence matches the subject matter of his testimony, the Court

recommends that Multifeeder's motion be denied.

Expert testimony must satisfy three prerequisites to be admissible under Fed. R.

Evid. 702:

> First, evidence based on scientific, technical, or other
> specialized knowledge must be useful to the finder of fact in
> deciding the ultimate issue of fact. This is the basic rule of
> relevancy. Second, the proposed witness must be qualified to
> assist the finder of fact. Third, the proposed evidence must be
> reliable or trustworthy in an evidentiary sense, so that, if the
> finder of fact accepts it as true, it provides the assistance the
> finder of fact requires . . . .

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). In addition to the elements under Fed. R. Civ. P. 702, "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786 (1993).

Both experts were asked to conduct computer analyses of various hard drives to determine if ESI had been destroyed intentionally.[19] These analyses required general knowledge in computer systems, including data storage and deletion processes. These analyses also required the use of specialized programs for finding evidence of deleted ESI and evidence of the use of wiping programs to delete ESI. The computer analyses also required skills for determining the manner wiping and encryption programs operate.

Multifeeder frames its motion entirely in terms of Chafe's educational background and the scope of his duties as a computer security specialist. Multifeeder contends that Chafe is unqualified to testify in this matter because Chafe was not trained as and does not work as a "computer forensic expert." Notably, Multifeeder does not challenge Chafe's knowledge, technical skill, training, and experience concerning computer systems, data storage and deletion processes, the use of specialized programs for finding stored and deleted ESI, or the analysis of wiping and encryption software.[20] The Court concludes that Chafe's testimony is useful to the Court; Chafe's knowledge, technical

---

[19] CFS was also asked to recover both deleted and non-deleted ESI using a keyword search. This task is not at issue for the purposes of the present motion.

[20] Moreover, Multifeeder makes no mention of the facts that Chafe's analysis is largely consistent with Lanterman's analysis and identified the encrypted volume and additional deletions by David Connolly, Jr., that CFS's analysis missed.

skill, training, and experience qualifies him to perform the tasks described above; Chafe's testimony is based upon sufficient facts; Chafe's testimony is the product of reliable principles and methods; and Chafe applied the principles and methods reliably to the facts of the case.   In short, Chafe satisfies the prerequisites of Fed. R. Evid. 702 and *Daubert*, 509 U.S. 579, 113 S. Ct. 2786.   The fact that Lanterman is able to form opinions regarding the topics at issue and bases his opinion on an analysis that may differ from the analysis used by Chafe does not disqualify Chafe from offering testimony.   *Cf. Smith v. BMW North America, Inc.*, 308 F.3d 913, 919 (8th Cir. 2002).   Therefore, the Court recommends that Multifeeder's motion to disqualify Chafe as an expert be denied.

### B.      Multifeeder's (Second) Motion for Sanctions

Multifeeder brings the present Motion for Sanctions, arguing that British should be subject to sanctions under Fed. R. Civ. P. 37(b)(2)(A) for intentionally destroying relevant evidence.   Multifeeder seeks dismissal of British's counterclaims with prejudice, entry of a default judgment in favor of Multifeeder, an award of attorneys' fees, and an award of costs and fees expended to litigate the present Motion for Sanctions. Multifeeder also moves to shift the fees of the ESI Protocol Order to British.   British opposes the motion, arguing that no intentional destruction of relevant evidence occurred and the sanctions sought by Multifeeder are unwarranted.

Federal Rule of Civil Procedure 37(b)(2)(A) addresses a court's authority to sanction a party's failure "to obey an order to provide or permit discovery."   For example, a party may violate an order to provide discovery by failing to permit inspection

of documents under Fed. R. Civ. P. 34 after being so ordered.  *See* Fed. R. Civ. P.

37(a)(3)(B)(iv).  In the present case, Multifeeder contends that British violated an order

to provide discovery by spoliating evidence, i.e., intentionally destroying, altering, or

concealing evidence.  *BLACK'S LAW DICTIONARY* 1531 (9th ed. 2009).  In addition to the

remedies available under Fed. R. Civ. P. 37, "[t]he district court retains an inherent power

to impose sanctions" for spoliation.[21]  *Strutton v. Meade*, 668 F.3d 549, 559 (8th Cir.

2012); *Dillon v. Nissan Motor Co., Ltd.*, 986 F.2d 263, 267 (8th Cir.1993); *see also

Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765, 100 S. Ct. 2455, 2463 (1980).

 "A spoliation-of-evidence sanction requires 'a finding of intentional destruction

indicating a desire to suppress the truth.'"  *Greyhound Lines, Inc. v. Wade*, 485 F.3d

1032, 1035 (8th Cir. 2007); *see also Morris v. Union Pacific R.R.*, 373 F.3d 896, 901 (8th

Cir. 2004).  "Intent is rarely proved by direct evidence, and a district court has substantial

leeway to determine intent through consideration of circumstantial evidence, witness

credibility, motives of the witnesses in a particular case, and other factors."  *Morris*, 373

F.3d at 902.  "[F]inding intent is a highly contextual exercise."  *Id.*  "When a corporation

is involved, the inquiry depends in part on corporate policies, but also to some extent on

the intent of corporate employees, not all of whom will play the same role in every case."

*Id.* at 902-03.

 The case law in this area demonstrates that spoliation exists on a continuum of

severity.  The degrees on the continuum take into account the egregiousness of the act of

---

[21] The Court also has civil contempt authority to address violations of court orders.
*See Chaganti & Associates, P.C. v. Nowotny*, 470 F.3d 1215, 1223 (8th Cir. 2006).

spoliation (i.e., the bad faith) and the significance of the destroyed evidence on the parties' ability to proffer claims and defenses (i.e., prejudice). *See Menz v. New Holland North America, Inc.*, 440 F.3d 1002, 1007 (8th Cir. 2006) (discussing the need to consider "bad faith" and "actual prejudice"). On the extreme end of bad acts, "witness death threats are more egregious than the destruction of evidence." *Dillon*, 986 F.2d at 268. Another significant act of spoliation is the destruction of information after a specific discovery request has been made concerning that information. *See, e.g.*, *Gallagher v. Magner*, 619 F.3d 823, 845 (8th Cir. 2010) ("To be sure, a district court does not abuse its discretion by imposing sanctions, even absent an explicit bad faith finding, where a party destroys specifically requested evidence after litigation has commenced."); *Stevenson v. Union Pacific R. Co.*, 354 F.3d 739, 750 (8th Cir. 2004) (holding that destruction of evidence "[a]fter the specific document request" concerning said evidence obviates any shield premised upon a routine document retention policy).

In terms of the degree of relevance, the Eighth Circuit Court of Appeals has affirmed significant sanctions for the destruction of the product that gave rise to the suit against the manufacturer. *See, e.g., Dillon*, 986 F.2d at 265 (destroyed automobile); *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 280 (8th Cir. 1995) (stating "[t]he tires remaining on the vehicle were critical to this litigation [involving defendant tire manufacturer] because only an examination of all four tires would conclusively establish the date of purchase of the failed tire and the mileage that was on it at the time of the accident"); *cf. Stevenson*, 354 F.3d 739, 750-51 (stating that "the offending party had destroyed the one piece of crucial physical evidence in the case"). In contrast, the

Eighth Circuit Court of Appeals has affirmed the denial of sanctions where the destroyed information was not relevant to a claim or defense. *See Groves v. Cost Planning and Management Intern., Inc.*, 372 F.3d 1008, 1010 (8th Cir. 2004). The Eighth Circuit Court of Appeals has also held that the availability of alternative evidence can mitigate the prejudice of spoliation. *See Greyhound Lines, Inc.*, 485 F.3d at 1035 (noting that, although some computer data from the vehicle was not preserved, other evidence was available concerning how the vehicle acted before the collision). All of these cases demonstrate that an assessment of spoliation is a case-by-case determination grounded in the specific facts before the court.

For the reasons set forth in this Report and Recommendation, the Court finds that British spoliated evidence and violated the ESI Protocol Order (Docket No. 84). British's sanctionable actions occurred well after litigation had commenced; after discovery was under way; after an admission by British that some discovery mistakes were made; and after issuance of the ESI Protocol Order. British's actions constituted intentional destruction of evidence indicating a desire to suppress the truth, were made in bad faith, and represent an abuse of the judicial process and fraud upon the Court.

The Court, therefore, recommends an order be issued directing as follows: (1) British shall be held in civil contempt; (2) within 90 days of the order on this Report and Recommendation, British shall pay $25,000.00 into the Court and $475,000.00 to Multifeeder; (3) Multifeeder shall pay CFS's outstanding invoices[22]; and (4) CFS shall

---

[22] Nothing in this analysis should be construed as considering or deciding Multifeeder or CFS's rights under the agreement between them.

deliver to the Court all copies of the imaged hard drives and cease all billable work on the present action.

### 1.     David Connolly, Jr.

Clear and convincing evidence supports that some of David Connolly, Jr.'s actions constitute spoliation.   The Court, therefore, recommends Multifeeder's Motion for Sanctions be granted with respect to some of David Connolly, Jr.'s actions and denied with respect to others, and further recommends that British be subject to significant sanctions.

Assuming arguendo that David Connolly, Jr., was only deleting pornography, he did so with the intent that the expert appointed under the ESI Protocol Order would not locate the pornography and, as such, his admitted action amounts to spoliation.  In fact, the Court cannot conclude that only pornography was deleted because the record establishes that David Connolly, Jr., deleted relevant and responsive files.  First, there are six confirmed deletions all occurring after *both* the commencement of this lawsuit and issuance of the ESI Protocol Order.  Second, *CCleaner* was activated on May 25, 2011, and *PGP Desktop* was utilized on May 20, 2011, just days before David Connolly, Jr.'s computer was scheduled to be imaged by CFS on its trip to British's office in Newfoundland.  *Contra Bakhtiari v. Lutz*, 507 F.3d 1132, 1135 (8th Cir. 2007) (holding that "the fact that deletion of [an] electronic account occurred before th[e] lawsuit was filed further undercuts [plaintiff's] claims" of spoliation).  Third, it is undisputed that David Connolly, Jr., had access to relevant information.  In fact, he communicated with

ALC so often that he had encryption software installed specifically for that purpose. Also, given that ALC was British's primary client and that there were very few e-mails produced between British and ALC, it is valid for Multifeeder to be concerned about British's spoliation of ESI.  Finally, when viewed in light of his prior deficient search for evidence, Dave Connolly, Jr.'s actions following the ESI Protocol Order can only be construed as intending to suppress relevant information.  Therefore, David Connolly, Jr.'s actions constitute spoliation because he knowingly destroyed ESI in an attempt to suppress the truth.  His actions evince bad faith.

In reaching this conclusion, the Court finds David Connolly, Jr.'s explanations implausible for several reasons:  First, the timing of David Connolly, Jr.'s deletions is itself highly suspect. Second, it defies credulity to believe that David Connolly, Jr., did not know his actions amounted to spoliation because (1) David Connolly, Jr., testified that he had relevant information on his computer; (2) he testified that his search for information was deficient; and (3) his deficient search for information formed part of the basis for the first motion for sanctions, which was granted in part.  Thus, David Connolly, Jr. was certainly on notice of the need to preserve information.  *Contra Stepnes v. Ritschel*, 663 F.3d 952, 965 (8th Cir. 2011).  Third, David Connolly, Jr.'s statement about deleting only two files is inconsistent with the six identified file deletions.

The Court does not base its spoliation finding or its credibility determination upon the mere presence of wiping software or the fact that *CCleaner* or *Spybot Search and Destroy* was used.  The record presently before the Court does not support that ESI was destroyed every time *CCleaner* or *Spybot Search and Destroy* was used.  Nevertheless,

the presence of wiping software, their undisputed use, and the timing of that use support the Court's findings and conclusion.

Therefore, the Court recommends that British be sanctioned for David Connolly, Jr.'s actions. Both David Connolly, Jr., and British were aware of British's responsibility to produce relevant documents following the September 2, 2010 Order, the March 25, 2011 Order, and the ESI Protocol Order. David Connolly, Jr., is an officer of British. The record does not include a policy concerning the retention of information. *Cf. Stepnes*, 663 F.3d at 965 (holding, in part, that destruction of relevant information under an information retention policy did not constitute spoliation); *see also Lewy v. Remington Arms Co., Inc.*, 836 F.2d 1104, 1111 (8th Cir. 1988). Based upon all of these factors, it is just and reasonable to sanction British.

## 2.     Blair Connolly

Clear and convincing evidence supports that some of Blair Connolly's actions constitute spoliation. The Court, therefore, recommends Multifeeder's Motion for Sanctions be granted with respect to some of Blair Connolly's actions and denied with respect to others, and further recommends that British be subject to significant sanctions.

As an initial matter, the Court concludes that several of the actions taken with respect to Blair Connolly's hard drives are consistent with the routine transfer and deletion of ESI during the normal course of business. First, the record supports that "Personal Folders.pst" was transferred from the unencrypted volume to the encrypted

volume of the New Laptop 012.[23]  *See* Supp. FSR, at 3.  Second, the record supports that "archive.pst" was transferred from Old Laptop 010 to the encrypted volume of the New Laptop 012.  Supp. FSR, at 3.

The Court, however, concludes that two other actions undertaken with respect to Blair Connolly's hard drives constitute spoliation.  Furthermore, Blair Connolly's actions were undertaken in bad faith.   First, he concealed the use of an encrypted volume and this act violated the Court's ESI Protocol Order and constitutes spoliation.  Second, an e-mail communication file from Blair Connolly's computer was destroyed.  Contrary to the protestations of British, the fact that the Court can confirm the deletions of pornographic materials from Blair Connolly's hard drives hardly absolves British of these other two specific acts of spoliation.

First, Blair Connolly violated the Court's ESI Protocol Order by failing to alert Multifeeder, CFS, or the Court of the presence of an encrypted volume.  The Court does not need to review or incorporate CFS's review of the TrueCrypt encryption software, *see* Supp. FSR, at 4, to know that the purpose of encryption software is to hide information. There are numerous legitimate business reasons to install and use encryption software; thus, the presence of encryption software alone does not violate any court order or discovery rule.  But, in this case, the installation of encryption software is an intentional wrongful act because it occurred after the September 2, 2010 Order on Multifeeder's

---

[23]  "Personal Folders.pst" is also found on the Old Laptop 010, but it is approximately 100 megabytes smaller than the file found by CFS to have been deleted and the file found on the encrypted volume of the New Laptop 012.  Supp. FSR, at 3.

Motion to Compel, and the encryption software apparently was installed only on the computer of the British employee who negotiated the agreement at issue in this litigation.

Additionally, ESI was obscured from discovery with the intent to suppress the truth when Blair Connolly failed to alert CFS, Multifeeder, or the Court of an encrypted volume. The Court had already previously found that "[t]hird-party expert discovery of British Confectionery's electronically stored information is necessary to ensure that British Confectionery has produced all relevant, nonprivileged information sought by Multifeeder." ESI Protocol Order, at *Finding of Fact* ¶ 6. The ESI Protocol Order directed that "British Confectionery shall provide CFS with reasonable access to its personnel and facilities so that CFS can implement this protocol." *Id.* at ¶ 2. Encompassed within "reasonable access to personnel and facilities" was access to the custodian's computers. *Id.* at ¶ 4. Blair Connolly knew that an encrypted and password-protected volume was installed and in use on his computer, and he failed to provide any notice that such a volume existed. Encryption software exists so that—without notice and a password—entities like CFS are unlikely to find and access the ESI stored on encrypted volumes.[24] Thus, the failure to provide any notice of the encrypted volume until November 2011 violated the ESI Protocol Order and amounts to spoliation of evidence.

British's failure to provide notice of the encrypted volume was not an innocent oversight for several reasons. First, Blair Connolly's deficient search and production of

---

[24] The fact that Chafe found and accessed the information on the encrypted volume does not negate this assumption.

responsive information formed part of the basis for the March 25, 2011 Order; thus, both Blair Connolly and British were apprised that the search and production previously completed were deficient. Second, there is no mention of the use of an encrypted volume in Blair Connolly's declaration to the Court in opposition to the first Motion for Sanctions. *See supra* n. 6 (Decl. Blair Connolly, at ¶ 16, Mar. 16, 2011).

In addition to the use of the encrypted volume, the Court concludes that spoliation occurred when the "British Group.pst" file was deleted from the unencrypted volume of Blair Connolly's New Laptop 012 with the intention to suppress the truth. The Court cannot construe the record to support that "British Group.pst" was simply transferred from the unencrypted volume to the encrypted volume. First, "British Group.pst" was deleted from the unencrypted volume on May 5, 2011—less than two weeks after the Court issued the ESI Protocol Order. Second, the "British Group.pst" file that was deleted is not the same size as the "British Group.pst" file found on the encrypted volume, which suggests that they are different files. Third, Blair Connolly's declarations only support the inference that there was one "British Group.pst" file that was created and it never changed locations. Thus, the Court concludes that ESI was destroyed with the intent to conceal the truth and it cannot be known what information was destroyed.

In reaching the above conclusion, the Court finds that CFS's conclusion that a PST file was deleted from the unencrypted volume of the New Laptop 012 to be credible notwithstanding the fact that Chafe did not reach the same conclusion and the record supports that a different PST file was transferred from the unencrypted volume to the encrypted volume. The fact that two deleted PST files identified by CFS correspond to

some degree with files found on the encrypted volume and on Blair Connolly's Old Laptop 010 adds veracity to CFS's conclusion.   Moreover, the Court also finds unavailing Blair Connolly's statement that all of the ESI from his Old Laptop 010 and New Laptop 012 have been backed up on other hard drives because this statement is inconsistent with both experts' analyses.

Like David Connolly, Jr., the Court recommends that British be sanctioned for Blair Connolly's actions. Both Blair Connolly and British were aware of British's responsibility to produce relevant documents.   Blair Connolly is an officer of British. The record does not include a policy concerning the retention of information.   Based upon all of these factors, it is just and reasonable to sanction British for the acts of spoliation by Blair Connolly.

### 3.   Other Spoliation Allegations

There are three other allegations of spoliation that must be considered: the reformatting allegation, the newly discovered hard drive, and the actions of British's attorneys.   For the reasons set forth below, the Court recommends that Multifeeder's motion be denied with respect to these remaining allegations.

The record does not support that the other actions by British or its employees identified by CFS constitute spoliation.   The Court is keenly aware that wiping and encryption software are commonplace; computers crash; computers are reformatted; computers are repurposed; and data and metadata are destroyed and rendered unrecoverable both intentionally and inadvertently.   The discovery rules do not

accomplish justice if they are construed as a cudgel for punishing litigants who continue to use their computers to conduct business and take appropriate precautions to preserve ESI. Prudent and good faith measures should be considered when misplacement and deletions occur. Imperfection and spoliation are not synonymous.

Here, there is nothing to suggest that the actions on hard drives 005, 006, 007, 008, 009, and 010, and the actions on hard drives 011 and 012 that were not already discussed above, were anything other than activities undertaken in the ordinary course of business. *See Bakhtiari*, 507 F.3d at 1135 (holding that credible IT evidence that appropriate steps were taken to back up evidence rebuts a claim of spoliation). Moreover, there is no evidence to suggest that reasonable efforts were not taken to preserve relevant material when actions were taken on hard drives 005, 006, 007, 008, 009, and 010.

The Court does not conclude that the failure to locate the undisclosed hard drive discovered by David Connolly, Jr., was intentional and, thus, the Court does not conclude that failure to surrender the hard drive to CFS amounted to spoliation. Any prejudice to Multifeeder is ameliorated by the fact that the Court disregarded Chafe's statements concerning the contents of the undisclosed hard drive when considering the Motion for Sanctions.

Finally, the record does not support that British's counsel spoliated any evidence, directed British to spoliate any evidence, or obscured facts from the Court concerning British's actions. The record does not support that British's counsel failed to conduct a reasonable inquiry before making representations to the Court following the September 2,

2010 Order. In fact, *the findings of the Court are against British*, and in no way directly or indirectly impugn the integrity, reputation or actions of British's counsel.

## C.    Sanctions

As stated earlier, the Court recommends that British be significantly sanctioned for the spoliation that occurred and its violation of the ESI Protocol Order. "'Sanctions are appropriately levied against a party responsible for causing prejudice when the party knew or should have known that the destroyed documents were relevant to pending or potential litigation.'" *Dillon*, 986 F.2d at 267 (quoting *Capellupo v. FMC Corp.*, 126 F.R.D. 545 (D. Minn. 1989)). Federal Rule of Civil Procedure 37(b)(2)(C) provides for payment of expenses following the failure to comply with a "court order" "instead of or in addition" to:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;
>
> (iv) staying further proceedings until the order is obeyed;
>
> (v) dismissing the action or proceeding in whole or in part;
>
> (vi) rendering a default judgment against the disobedient party; or
>
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A)(i)-(vii).  The Court must "fashion an appropriate sanction for conduct which abuses the judicial process. . . . [O]utright dismissal of a lawsuit . . . is a particularly severe sanction." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45, 111 S. Ct. 2123, 2132-33 (1991).  Moreover, "[s]evere spoliation sanctions, such as an adverse inference instruction, are only appropriate upon a showing of bad faith."  *Stepnes*, 663 F.3d at 965 (citing *Menz*, 440 F.3d at 1006).

There is prejudice in the present case.  First, neither the Court nor Multifeeder will ever know what ESI was destroyed by Blair Connolly and David Connolly, Jr.; but it is undisputed that both Connollys had access to relevant information.  Second, adjudication of this discovery dispute has dramatically delayed and exponentially increased Multifeeder's fees and costs of this litigation.

Nevertheless, the prejudice in the present case is mitigated by a number of considerations.  The system created by Multifeeder has not been destroyed and, therefore, the degree to which Multifeeder's system satisfied the terms of the agreement that gave rise to this commercial dispute can be evaluated independent of British or ALC's subjective assessment of the system's performance.  *Cf. Menz*, 440 F.3d at 1006.  Furthermore, all of the employees at British have been or can be deposed, which ameliorates the loss of ESI.

In addition to prejudice, the Court must also consider that this is the second sanction order in this matter.  British previously violated the September 2, 2010 Order, which warranted the March 25, 2011 Order.  The March 25, 2011 Order gave rise to the

ESI Protocol Order.  In terms of the present motion, the Court concludes that British violated the ESI Protocol Order and spoliated evidence.  Thus, the Court must render a sanction that is proportional and calibrated to the prejudice at issue, reflects British's multiple violations of court orders, and ensures British's future compliance with Court orders and the rules of discovery.

The Court has considered the facts and the sanctions at the Court's disposal.  An order prohibiting British from supporting or opposing a claim or defense is inappropriate at this juncture because discovery is not yet completed.  *See* Fed. R. Civ. P. 37(b)(2)(A)(ii).  This matter was already stayed and no further stay order will change the impact of the spoliation at issue. *See id.* at 37(b)(2)(A)(iv).  An order striking or dismissing British's counterclaim, or entering of default judgment, *see id.* at 37(b)(2)(A)(iii)-(vi), is inappropriate because discovery has not been completed; the system has not been destroyed; there is a strong policy favoring adjudication of disputes on the merits; and there are other significant sanctions available.

Certainly, an adverse inference instruction is one such significant and appropriate sanction.  *See* Fed. R. Civ. P. 37(b)(2)(A)(i).  It is established that British acted in bad faith by intentionally destroying ESI, and Multifeeder has been prejudiced because no one will ever be able to know fully what information was destroyed.  Therefore, the Court recommends an adverse inference instruction be given concerning British's destruction of ESI.  The specific contours of the instruction are more appropriately deferred for determination at trial, where the Court will have the benefit of considering the entire record in this matter and briefing from the parties on the issue. *See Monarch*

*Fire Protection v. Freedom Consulting & Auditing Services, Inc.*, 644 F.3d 633, 639 (8th Cir. 2011) (holding that it is not an abuse of discretion to defer sanction considerations until trial).

In addition, the Court recommends that British be held in civil contempt of court under Fed. R. Civ. P. 37(b)(2)(A)(vii).  The Eighth Circuit Court of Appeals has stated: "A district court may impose civil contempt sanctions for one of two purposes: to compensate parties aggrieved by contumacious conduct or to coerce compliance with the court's orders."  *Chaganti & Associates, P.C. v. Nowotny,* 470 F.3d 1215, 1224 (8th Cir. 2006) (citing *United States v. United Mine W*orkers, 330 U.S. 258, 303, 67 S. Ct. 677 (1947)).  The Court concludes that both purposes are fulfilled by holding British in contempt under Fed. R. Civ. P. 37(b)(2)(A)(vii).  First, Multifeeder has been aggrieved by British's contumacious conduct, as stated above. Second, only a holding of civil contempt will ensure future compliance with the Court's orders.

Pursuant to the civil contempt holding, the Court recommends that British be ordered to pay into the Court $25,000.00 as a sanction and that British be order to pay expenses to Multifeeder in the amount of $475,000.00, under the Court's civil contempt authority and as reasonable expenses caused by British's actions under Fed. R. Civ. P. 37(b)(2)(C).  The Court finds that the aggregate amount of $475,000.00 represents reasonable expenses because it encompasses much of CFS's current unpaid invoices, some past paid amounts by Multifeeder to CFS, and reasonable legal fees and costs for litigating this discovery debacle.  The amount payable to Multifeeder is both measured for proportionality and calibrated to redress the prejudice caused by British.  The amount

50

addressed to the Court is significant enough to ensure future compliance with the Court's orders. The Court recommends that these amounts be due and payable in full from British to Multifeeder and into the Court within 90 days of the order on this Report and Recommendation.

### D.    CFS's Unpaid Invoices

The ESI Protocol Order directed Multifeeder to pay CFS for "[a]ll costs reasonably incurred by CFS in the implementation of [the ESI Protocol Order] that have not otherwise been designated as the responsibility of British." ESI Protocol Order, at ¶ 12. There is no basis for altering the ESI Protocol Order. CFS's invoiced fees and costs are significant, but conducting a forensic examination of a corporation's computer systems is a significant undertaking. At the time that Multifeeder requested appointment of CFS as its forensic expert, Multifeeder grossly understated the cost of a forensic examination of British's computers. Multifeeder was the only party in position to assess the possible fees and costs associated with a forensic examination of British's computers because of its existing contract with CFS. In addition to grossly understating the cost of its proposed forensic examination to Chief Magistrate Judge Boylan, Multifeeder did not disclose to the Court the terms of the contract between Multifeeder and CFS. As such the Court was not apprised of the significant fees and costs not covered by the proposed protocol submitted by Multifeeder. Therefore, the Court recommends that Multifeeder be

ordered to pay all of CFS's unpaid invoices to date consistent with the ESI Protocol Order and the agreement between Multifeeder and CFS.[25]

### E.      Discontinuation of CFS's Involvement in this Action

CFS has fulfilled its role under the ESI Protocol Order.  Assuming that the Court adopts the findings of fact in this Report and Recommendation, the Court recommends that the Order on this Report and Recommendation also direct as follows:

1.     CFS shall cease all billable activity in this matter unless such billing is permitted under Fed. R. Civ. P. 45.

2.     To the extent that CFS has not done so already, within seven days of the order on this Report and Recommendation, CFS shall provide to British's local counsel an electronic copy of the detailed log from Paragraph 10 of the ESI Protocol Order (Docket No. 84), and a copy of the compact disc attached to the Court's copy of the Forensic Services Report, dated August 12, 2012.

3.     Within seven days of the order on this Report and Recommendation, CFS shall deliver to the chambers of United States Magistrate Judge Tony N. Leung, Warren E. Burger Federal Building and U.S. Courthouse, 316 N. Robert Street, Suite 342, St. Paul MN 55101, the original hard drives containing the recreated copies of each custodian's personal computers,

---

[25] Nothing in this analysis should be construed as considering or deciding Multifeeder or CFS's rights under the agreement between them.

identified as System Numbers 001 through 012 in the Forensic Services Report, dated August 12, 2012.

4.      After completing the aforementioned tasks, CFS shall wipe its systems of all data in its possession from this action that it would not otherwise keep in the ordinary course of business.

**F.      Epilogue**

Unfortunately for the parties, this perilous discovery odyssey may not yet be finished. The unpredictable telemetry of this litigation could well require further motion practice retracing some of the same ground if a review of the recovered files reveals that ESI responsive to Multifeeder's Document Request Nos. 31, 51 and 53 was not disclosed.

**IV.**

Based upon the foregoing Findings and Conclusions, the record, memoranda and arguments of counsel, the undersigned Magistrate Judge makes the following:

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that:

1.  Plaintiff Multifeeder Technology, Inc.'s (Second) Motion for Sanctions (Docket No. 104) be **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.    Defendant British Confectionery Company Limited be held in civil contempt under Fed. R. Civ. P. 37(b)(2)(A)(vii).

b. Defendant British Confectionery Company Limited be ordered to pay into the Court a sanction of $25,000.00.  This amount is to be due and payable in full within 90 days of the order on this Report and Recommendation.

c. Defendant British Confectionery Company Limited be ordered to pay to Plaintiff Multifeeder Technology, Inc. $475,000.00. This amount is to be due and payable in full within 90 days of the order on this Report and Recommendation.

d. Plaintiff's motion be denied in all other respects.

2. Docket No. 142 be **UNSEALED**.

3. Defendant British Confectionery Company Limited's Objection to the Unsealing of the Compact Disc Accompanying Attachment # 4 (Docket No. 144) be **OVERRULED AS MOOT** because Docket No. 142 did not include the compact disc as an attachment.

4. Plaintiff Multifeeder Technology, Inc. be ordered to pay to Computer Forensic Services, Inc. (CFS), within 90 days of the Order on this Report and Recommendation, all unpaid invoices to date pursuant to the ESI Protocol Order (Docket No. 84) and Multifeeder and CFS's rights under the agreement between them.

5. Computer Forensic Services (CFS) be directed as follows:

a. Immediately cease all billable activity in this matter unless such billing is permitted under Fed. R. Civ. P. 45.

b.  To the extent that CFS has not done so already, within seven days of the order on this Report and Recommendation, CFS shall provide to British's local counsel an electronic copy of the detailed log from Paragraph 10 of the ESI Protocol Order (Docket No. 84), and a copy of the compact disc attached to the Court's copy of the Forensic Services Report, dated August 12, 2012.

c.  Within seven days of the order on this Report and Recommendation, CFS shall deliver to the chambers of United States Magistrate Judge Tony N. Leung, Warren E. Burger Federal Building and U.S. Courthouse, 316 N. Robert Street, Suite 342, St. Paul MN 55101, the original hard drives containing the recreated copies of each custodian's personal computers, identified as System Numbers 001 through 012 in the Forensic Services Report, dated August 12, 2012.

d.  After completing the aforementioned tasks, CFS shall wipe its systems of all data in its possession from this action that it would not otherwise keep in the ordinary course of business.


Dated: April 26, 2012                              _____s/ Tony N. Leung_____
                                                   Magistrate Judge Tony N. Leung
                                                   United States District Court
                                                   for the District of Minnesota

                                                   CIVIL NO. 09-1090 (JRT/TNL)

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and by serving upon all parties written objections that specifically identify the portions of the Report to which objections are made and the basis of each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **May 11, 2012**.