# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MULTIFEEDER TECHNOLOGY, INC., *a Minnesota corporation*, | Civil No. 09-1090 (JRT/TNL) |
| Plaintiff, | |
| v. | |
| BRITISH CONFECTIONERY COMPANY LIMITED, *a duly incorporated under the laws of Province of Newfoundland*, and DOMINO AMJET, INC., | |
| Defendants, | **MEMORANDUM OPINION AND ORDER ON REPORT AND RECOMMENDATION DATED APRIL 26, 2012** |
| AND | |
| BRITISH CONFECTIONERY COMPANY LIMITED, *a duly incorporated under the laws of Province of Newfoundland*, | |
| Counter claimant, | |
| v. | |
| MULTIFEEDER TECHNOLOGY, INC., *a Minnesota corporation*, | |
| Counterclaim Defendant / Third-Party Plaintiff, | |
| v. | |
| DOMINO PRINTING SOLUTIONS, INC., | |
| Third-Party Defendant. | |

---

William Christopher Penwell, **SIEGEL BRILL GREUPNER DUFFY & FOSTER, PA**, 100 Washington Avenue South, Suite 1300, Minneapolis, MN 55401; and Kristin L. Kingsbury, Gerald S. Duffy, and Michael R. Moline, **MONROE MOXNESS BERG, PA**, 8000 Norman Center Drive, Suite 1000, Minneapolis, MN 55437, for Multifeeder Technology, Inc..

R. Christopher Sur and Paul B. Civello, **MASLON EDELMAN BORMAN & BRAND, LLP**, 90 South 7th Street, Suite 3300, Minneapolis, MN 55402, for British Confectionery Company Limited.

Emily E. Duke, Cynthia A. Moyer, Keri A. McWilliams, and Sarah C.S. McLaren, **FREDRIKSON & BYRON, PA**, 200 South 6th Street, Suite 4000, Minneapolis, MN 55402-1425, for Domino Printing Solutions, Inc. and Domino AmJet, Inc.

Before the Court are the parties' objections to the Report & Recommendation ("R&R") of United States Magistrate Judge Tony N. Leung[1] on Plaintiff Multifeeder's Second Motion for Sanctions. (R&R, Apr. 26, 2012, Docket No. 152.) This breach of contract case has degenerated into an extremely costly discovery debacle. Plaintiff Multifeeder Technology, Inc. ("Multifeeder") has again moved for sanctions, and the Magistrate Judge recommended awarding significant sanctions for Defendant and Third-Party Plaintiff British Confectionery Company Limited's ("British's") intentional destruction of relevant evidence. Having considered *de novo* those portions of the R&R to which the parties timely objected, *see* 28 U.S.C. § 636(b)(1)(C), D. Minn. L.R. 72.2(b), as described below, the Court will adopt the R&R in part and reject it in part. Multifeeder's motion for sanctions will be granted in part.

---

[1] On April 5, 2011, this case was reassigned to Magistrate Judge Leung from Magistrate Judge Arthur J. Boylan.

# BACKGROUND[2]

## A.     The Parties and the Underlying Dispute

Multifeeder designs and manufactures systems used in the packaging, printing, and mailing industries.  (Compl. ¶ 1, May 8, 2009, Docket No. 1; Answer & Countercl. ¶ 2, Jan. 6, 2010, Docket No. 27.)  British prints break-open lottery and pull-tab tickets. (Compl. ¶ 2; Answer & Countercl. ¶ 4.)   Third-Party Defendant Domino Printing Solutions, Inc. ("Domino") creates coding and printing components for variable data, such as bar codes.  (Am. Third-Party Compl. ¶ 2, Aug. 23, 2010, Docket No. 50.)

Alleging that British had breached a contract pursuant to which Multifeeder was to design and construct a system capable of printing two-sided, break-open lottery tickets, Multifeeder brought this action in May 2009.  (Compl. ¶ 7; Answer & Contercl. ¶ 7.) The parties understood that Multifeeder's system needed to work with Domino's printing components, and British concluded after an inspection that the system did not function with the components at the rate it expected.  (Answer & Countercl. ¶¶ 7, 21, 26; Am. Third-Party Compl. ¶¶ 6-7, 19-22.)  Accordingly, British concluded that Multifeeder had defaulted under the contract and cancelled its purchase of the system.  (Compl. ¶¶ 18-19; Answer & Countercl. ¶¶ 28-30; Am. Third-Party Compl. ¶¶ 19-22.)   British asserted counterclaims against Multifeeder for breach of contract and unjust enrichment, (Answer & Countercl. ¶¶ 36-44), and Multifeeder brought a Third-Party Complaint against

---

[2] For a more complete recitation of the facts, see the R&R at 3-32.

Domino asserting claims of indemnity and contribution, (Am. Third-Party Compl. ¶¶ 26-35).

### B.    Genesis of the Discovery Dispute

In August 2010, Multifeeder moved to compel British to produce responses to certain document requests.  (Docket No. 45.)  Generally speaking, Multifeeder requested documents and communications relating to British's relationship with the Atlantic Lottery Corporation ("ALC"), one of British's most significant customers for break-open lottery tickets.  (Answer & Countercl. ¶ 4; Multifeeder's Mem. in Supp. of Mot. to Compel Discovery at 5-6, Aug. 9, 2010, Docket No. 47.)  The information was relevant, Multifeeder argued, because Multifeeder's contract with British stemmed from British's contract with ALC, and ALC had acquired test samples (sheets) from Multifeeder's system after British's inspection.  That is, Multifeeder sought this information as proof that its system was able to perform per the contract's specifications.  (Multifeeder's Mem. at 5.)  The Court granted Multifeeder's motion to compel.  (Order, Sept. 2, 2010, Docket No. 52.)

Six months later, Multifeeder moved for an order sanctioning British for failure to comply with the order to compel and asked the Court to appoint a computer forensic expert to image and search British's computers for responsive documents.  (Docket No. 63.)  British acknowledged various deficiencies in its production, but – averring that it was correcting its mistakes – opposed sanctions and argued that appointment of a forensic expert was unnecessary.  (British Mem. in Opp'n to Mot. for Sanctions at 15,

Mar. 16, 2011, Docket No. 72.)[3]  The Magistrate Judge ultimately concluded that "British did not accurately represent circumstances relating to discovery in connection with a previous motion to compel . . . and has failed to fully comply with court's Order dated September 2, 2010 . . . and sanctions are therefore warranted." (Order ¶ 2, Mar. 25, 2010, Docket No. 79.)  The Magistrate Judge, however, declined to find British in contempt because Multifeeder had not persuasively shown that British had acted intentionally or in bad faith with respect to its discovery obligations.  (*Id.*)  Based on this finding, the Magistrate Judge ordered the parties to try to reach an agreement regarding remaining electronic discovery and, absent agreement, to submit an independent proposal from which the Court would construct an order establishing an electronic discovery protocol. (*Id.* ¶ 5.)

The parties did not reach an agreement.  Rather, Multifeeder proposed the appointment of Computer Forensic Services ("CFS") to image and search British's computers and a variety of procedures, cost allocations, and search terms.  (Multifeeder's Proposed Protocol ¶¶ 1, 2-7, Apr. 14, 2011, Docket No. 81.)  British objected to bearing the cost of any imaging and proposed as an alternative that it be permitted to conduct its own search with specified search terms.  (Decl. of Christopher Sur, Ex. B, Nov. 18, 2011, Docket No. 117.)  After considering both parties' proposals, the Magistrate Judge appointed CFS as the exclusive third-party expert to image and search British's

---

[3] The Magistrate Judge questioned Multifeeder's counsel about the cost of appointing a computer forensic expert, and Multifeeder estimated the cost to be "in the range of $10,000 plus travel." (Hr'g Tr. at 10:12-13:5, Apr. 10, 2012, Docket No. 148.)

computers and ordered CFS to prepare a detailed log of all relevant documents. (Finding of Fact, Conclusions of Law, and Electronically Stored Info. Search Protocol Order ("ESI Protocol Order") ¶¶ 1-11, Apr. 26, 2011, Docket No. 84.)[4]

### C.   CSI's Findings and the Present Motion

CFS undertook the imaging and analysis contemplated in the ESI Protocol Order and subsequently contacted chambers to report that "certain files were purged or deleted shortly before" its arrival at British's facility. (Order, June 20, 2011, Docket No. 88.) The Court directed CFS to create a log detailing documents that CFS believed were relevant and deleted between October 1, 2007, and the time CFS arrived to image the

---

[4] As to allocating costs between the parties, the ESI Protocol Order provided:

12.   Multifeeder shall bear the following costs related to the implementation of this order:

    a.   CFS's travel costs, including airfare and accommodations.

    b.   CFS's fees for searching the "recreates" of each Custodian's personal computer(s) and creating the detailed log and copies of relevant documents.

    c.   All costs reasonably incurred by CFS in the implementation of this protocol that have not otherwise been designated as the responsibility of British Confectionery.

13.   [British] shall bear the following costs related to the implementation of this order:

    a.   CFS's time for travel, at CFS's hourly rate of $275/hour.

    b.   CFS's hourly rate – $275/hour – to create the accurate representations of the personal computers. [British] shall not bear the cost of more than 24 personnel work hours used in creating the accurate representations of the personal computers.

    c.   CFS's per device fee of $300 per personal computer and $500 per server drive.

computers.  (*Id.*; Order, Aug. 10, 2011, Docket No. 94.)  CFS later provided the Court

with this Forensic Services Report ("FSR").  (Case Mgmt. Order, Attachment #4,

Mar. 26, 2012, Docket No. 142.)  The FSR details what CFS describes as the "intentional

destruction of data," including the use of commercial wiping software on David

Connolly, Jr.'s laptop; the deletion of certain files from Blair Connolly's computers; and

the reformatting of various hard drives.  (*Id.* at 5-6.)

### D.    Report and Recommendation

Multifeeder brought the present motion for sanctions based on CFS's allegations.

British opposed the motion, offering the testimony and declarations of Wade Chafe, an

information technology security specialist with EWA-Canada Limited.  The Magistrate

Judge reviewed the parties' arguments and evidence, and, as germane to the present

objections, made the following findings and recommendations.[5]

### 1.    David Connolly, Jr.

The Magistrate Judge found that clear and convincing evidence supports that some

of David Connolly, Jr.'s actions constitute spoliation and recommended that British be

subject to significant sanctions with respect to his conduct.  (R&R at 39.)  The Magistrate

Judge based his conclusion that David Connolly, Jr. deleted relevant and responsive files

on several considerations: (1) the record shows six deletions occurring after both the

---

[5] The Magistrate Judge recommended denying Multifeeder's motion with respect to several other spoliation allegations.  (R&R at 45-47.)  Neither party objected to those recommendations, and the Court will adopt them.

commencement of the lawsuit and issuance of the ESI Protocol Order, (2) certain wiping software was utilized on May 20 and 25, 2011, just days before CFS was slated to image David Connolly, Jr.'s computer, (3) David Connolly, Jr. had access to relevant information, and (4) when viewed in light of his prior deficient search for evidence, David Connolly, Jr.'s actions following the ESI Protocol Order can only be construed as intending to suppress relevant information.  (*Id.* at 39-41.)

### 2.   Blair Connolly

The Magistrate Judge found that "[c]lear and convincing evidence supports that some of Blair Connolly's actions constitute spoliation" and recommended that British be subject to significant sanctions for his behavior.  (*Id.* at 41.)  Specifically, the Magistrate Judge found that two actions constitute spoliation and that these actions were taken in bad faith.  First, Blair Connolly concealed the use of an encrypted volume from CFS by failing to alert Multifeeder, CFS, or the Court about its presence.  Second, an alleged e-mail communication file, "British Group.pst," was permanently deleted from the unencrypted volume of Blair Connolly's laptop on May 5, 2011.  (*Id.* at 42, 44.)

### 3.   Sanctions

The Magistrate Judge recommended significant sanctions for British's spoliation of evidence and violation of the ESI Protocol Order.  (*Id.* at 47.)  Because Multifeeder will never know what information was destroyed, and because litigation of this discovery dispute has delayed resolution of the case and dramatically increased Multifeeder's costs, the Magistrate Judge recommended finding that British's actions have prejudiced

Multifeeder.   (*Id.* at 48.)   Yet the Magistrate Judge found that this prejudice was mitigated to some extent because (1) the Multifeeder system has not been destroyed and thus the extent to which the system satisfied the terms of the agreement giving rise to the dispute can be assessed independently of the spoilated evidence, and (2) British's employees have been or can be deposed, allowing Multifeeder to uncover some of the evidence that was destroyed through alternative means.   (*Id.*)   After considering all the facts and sanctions at the Court's disposal, the Magistrate Judge recommended that (1) an adverse inference instruction be given with regard to British's destruction of evidence, and (2) British be held in civil contempt, and ordered to pay $25,000 to the Court and $475,000 to Multifeeder.   As to the $475,000, the Court found that amount to constitute reasonable expenses under Fed. R. Civ. P. 37(b)(2)(C) because "it encompasses much of CFS's current unpaid invoices, some past paid amounts by Multifeeder to CFS, and reasonable legal fees and costs for litigating this discovery debacle."   (*Id.* at 50.)

## ANALYSIS

Federal Rule of Civil Procedure 37(b)(2)(C) requires the court to "order the disobedient party . . . to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."   Rule 37 "authorizes an award encompassing all expenses, whenever incurred, that would not have been sustained had the opponent conducted itself properly."   *Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1012 (8th Cir. 1993) (internal quotation marks omitted).   Rule 37 sanctions should be crafted to both punish and deter.

*See id.*   A spoliation-of-evidence sanction requires "a finding of intentional destruction indicating a desire to suppress the truth." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (internal quotation marks and citation omitted).   "Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pac. R.R.,* 373 F.3d 896, 901 (8th Cir. 2004).   Here, British does not dispute that some sanction is warranted; the issue for the Court is the nature and extent of the sanction in light of the facts and circumstances of this case.   The Court will first address British's objections before turning to Multifeeder's objections, and to determining an appropriate sanctions award.

## A.     British's Objections

British objects to the R&R's findings and recommendations with respect to the conduct of David Connolly, Jr. and Blair Connolly.   British also objects that the recommended $475,000 sanction is too high because Multifeeder is at least partly responsible for CFS's massive costs.   The Court will address each objection in turn.

### 1.     David Connolly, Jr.

The Magistrate Judge found that clear and convincing evidence supports that some of David Connolly, Jr.'s actions constitute spoliation and recommended that British be subject to significant sanctions with respect to his conduct.   (R&R at 39.)   British objects to the conclusion that David Connolly, Jr. destroyed "evidence" and that he "deleted relevant and responsive files" and "relevant information."   (British's Objs. at 3, May 11,

2012, Docket No. 159.)   In support of its objection, British points to David Connolly, Jr.'s sworn statement that no materials relating to the Multifeeder litigation were among the deleted files.   British also argues "there is no factual basis to conclude that relevant files were deleted" because only David Connolly, Jr.'s declaration speaks to what was deleted. (*Id.*)

The Court will overrule this objection.   Preliminarily, the Court cannot reasonably rely on David Connolly, Jr.'s testimony that he did not delete relevant files in the face of ample circumstantial evidence to the contrary.   Crucially, both CFS and British's expert agree that six files were deleted and permanently overwritten from David Connolly, Jr.'s computer.   Commercial wiping software was utilized on the computer just days before CFS imaged it.   It is undisputed that David Connolly, Jr. had access to relevant information, and it cannot be doubted that he was on notice of the need to preserve information because his previous deficient search formed part of the basis for Multifeeder's first (successful) sanctions motion.   British's argument in the face of this evidence that Connolly, Jr. was not "motived to do anything other than remove embarrassing materials," (British's Objs. at 4), simply fails to persuade.   To be sure, the mere presence of commercial wiping software on David Connolly, Jr.'s computer does not lead inexorably to the conclusion that David Connolly, Jr. spoilated evidence.   But the timing of the software's undisputed use, viewed in light of the prior deficient search, leads the Court to conclude that David Connolly, Jr.'s actions constituted spoliation.

###### 2.    Blair Connolly

British objects to both bases of the recommended spoliation finding, namely (1) that Blair Connolly concealed the use of an encrypted volume from CFS and (2) that an e-mail communication file (a PST file) from Connolly's computer was destroyed.  As to the first basis, British argues that Blair Connolly had "no desire or motive to conceal anything," and that he "never instructed David Connolly, Jr. or anyone else to conceal from CFS the existence of the encryption software."  (British's Objs, at 4-5.)  As to the second basis of the spoliation finding, British objects that (1) Blair Connolly has testified that he did not delete any PST files, (2) British's expert was unable to find any evidence of the deleted index files that CFS asserts reference the existence of this PST file, and (3) even deletion of the files would not amount to spoliation because (a) the unencrypted file that was deleted was merely an earlier version of the encrypted file of the same name that was not deleted, and (b) all emails in the file were created after the cut-off period of the ESI Protocol Order, and are thus not relevant under the terms of the order.

The Court will overrule British's objections.  First, as to the encryption software, the Court finds unpersuasive the notion that Blair Connolly had "no reason to think that the CFS representative would not be able to access" the encrypted volume.  (British's Objs. at 5-6.)  And that Blair Connolly never explicitly directed anyone to conceal the existence of the encrypted software from CFS is rather beside the point.  In January 2011, after the Court's first sanctions order but before the ESI Protocol Order, Blair Connolly instructed British's IT personnel to add security protection for the email on his new laptop, which he later discovered to be "some form of encryption software."  (Decl. of

Blair Connolly ¶ 2, May 11, 2012, Docket No. 160.)  Blair Connolly need not have been aware of "the technical nature," (*id.*) of the encryption software to understand that CFS would – at a minimum – need a password to access it.

Preliminarily, the Court agrees with British that the installation of encryption software did not, in itself, constitute an intentional wrongful act because neither the September 2010 Order compelling discovery nor the March 2011 sanctions order prohibit British from taking steps to safeguard confidential information.  Nonetheless, the Court finds that Blair Connolly's failure to provide any notice to Multifeeder, CFS, or the Court that an encrypted volume existed violated the ESI Protocol Order and amounts to spoliation of evidence.  The ESI Protocol Order required British to "provide CFS with reasonable access to its personnel and facilities" – including access to the custodian's computers – "so that CFS can implement this protocol."  (ESI Protocol Order ¶¶ 2, 4.)  Blair Connolly knew that his previous search and production were deficient, that the adequacy of British's production was the subject of extensive litigation, and that an encrypted volume existed on his computer.  Under the circumstances of this case, therefore, the Court finds that British's failure to provide notice of the encrypted volume until November 2011 was not an innocent oversight.

Second, as to the "British Group.pst" file, the Court finds that its deletion from the unencrypted volume on Blair Connolly's laptop constitutes spoliation.  First, the Court declines to credit Blair Connolly's testimony to the extent direct evidence presented by the Court-appointed expert contradicts it: CFS concluded that the file was deleted from the unencrypted volume on May 5, 2011, less than two weeks after the Court issued the

ESI Protocol Order.  Blair Connolly's testimony that he did not delete any files on this date is simply not credible.  Second, and similarly, that British's expert was unable to find evidence of the existence of the deleted PST file does not meaningfully undermine CFS's contrary finding.  Third, on this record the Court cannot credit British's arguments about the contents of the deleted file – that it contained only irrelevant emails and that it was simply an earlier version of an undeleted file located in the encrypted volume.  It is **possible** that the deleted file is simply an earlier version of the undeleted file.  It is **possible** that the file contained only irrelevant emails.  But we will never know because the unencrypted file was permanently deleted and overwritten – less than two weeks after the Court issued the ESI Protocol Order.  The Court's solemn and unenviable task is to make factual and credibility determinations in the face of uncertainty.  *See Morris*, 373 F.3d at 902.  On this record and in light of British's previous conduct, the only reasonable conclusion is that the permanent deletion of the British Group.pst file constitutes spoliation.

### 3.    CFS's Non-Disclosure of Rapidly Increasing Fees

Finally, British argues that the award of $475,000 to cover "reasonable expenses caused by British's actions" must be reduced because Multifeeder is at least partly responsible for CFS's ballooning expenses.  Specifically, British argues that some portion of the $475,000 is not reasonably attributable to British because CFS disclosed to Multifeeder in *ex parte* fashion that the fees would be greater than expected, and Multifeeder authorized the work to begin and failed to disclose the increased cost to

British or the Court until it was too late to do anything about them.  (*See* Aff. of Mark Lanterman ¶ 7, Feb. 24, 2012 ("Before commencing the search and analysis, I explained the potentially significant costs to [counsel] during two separate phone calls.  She did not voice any financial concerns and authorized the work to begin.").)

The Court finds that it was largely British's conduct – not Multifeeder's – that caused CFS's ballooning fees.  Following the ESI Protocol Order, CFS acted as the Court-appointed expert and performed only the work ordered by the ESI Order and the Court.  (ESI Protocol Order ¶¶ 4-10; Lanterman Aff. ¶ 5 ("To be specific, CFS implemented the protocol outlined in the Court's ESI Order.").)   The Court – not Multifeeder – directed CFS's work.  (*See* ESI Protocol Order ¶ 1 (appointing CFS as third-party expert and ordering CFS to cease all other work on behalf of either party unless permitted by the order).)  It is no fault of Multifeeder that documenting the extent of British's drive-wiping was extremely time-consuming.  (*See* Lanterman Aff. ¶¶ 5 11-14.)  Yet the Court does find that Multifeeder is not entirely blameless because it was the only party in a position to assess the possible fees and costs associated with a forensic examination of British's computers in view of its prior contract with CFS, and when queried by the Magistrate Judge, Multifeeder grossly underestimated the possible costs involved.  (Hr'g Tr. at 10-13, Apr. 10, 2012, Docket No. 148.)  Even if the 10,000 figure was accurate for a simple trip to collect data – but not for the recovery and restoration mission that British's conduct ultimately necessitated – Multifeeder was aware that CFS's costs were exploding far beyond its estimate long before it informed British or the Court.  Regardless, the Court remains unpersuaded by British's suggestion that – in light of

Multifeeder's failure to notify the Court of CFS's ballooning expenses – "a large portion" of the $475,000 sanctions award is unreasonable.  Indeed, as described below, the Court finds that $475,000 is insufficient under the circumstances.

### B.    Multifeeder's Objections

Multifeeder also objects to the R&R.  It objects to two of the Magistrate Judge's recommendations and four alleged factual inaccuracies that may have provided a basis for those recommendations.   Specifically, Multifeeder argues that the recommended $475,000 sanction award fails to adequately cover the reasonable expenses it incurred as a result of British's conduct and objects to the recommendation that it pay CFS directly and/or before it receives payment of the sanctions award from British.  It also objects to the Magistrate Judge's findings as to (1) the amount of CFS fees claimed to be outstanding and the status of payment, (2) whether the prejudice that British caused to Multifeeder may be mitigated, (3) the damages claimed by the parties, and (4) Multifeeder's responsibility for the appointment of CFS as the Court's third-party expert.  British only responds specifically to the claim that Multifeeder's prejudice cannot be mitigated.[6]  The central issues here are the appropriate amount of the sanction award given the prejudice to Multifeeder and the manner in which CFS's fees are to be paid.

---

[6] British does not dispute Multifeeder's correction of CFS's accounting, and the Court will therefore adopt Multifeeder's undisputed accounting of CFS's outstanding fees.  British also does not dispute Multifeeder's proposed corrections to the Report regarding the damages claimed by the parties or the Court's appointment of CFS as its third-party expert.  Accordingly, the Court adopts Multifeeder's proposed corrections as set forth on page 13 of its objections. (Docket No. 164.)  The Court finds that, as to the damages claimed by the parties, British seeks

(Footnote continued on next page.)

Preliminarily, the Court must discuss whether the availability of alternative evidence might mitigate the extent of Multifeeder's prejudice.  *See Greyhound Lines, Inc.*, 485 F.3d at 1035 (observing – in concluding that the district court did not err in declining to find spoliation – that while some evidence was not preserved, other remaining evidence spoke to the subject matter at issue).  The Magistrate Judge found that Multifeeder's prejudice may be mitigated because: (1) the Multifeeder system can be evaluated independently of the spoilated evidence since the system has not been destroyed, and (2) further depositions of British representatives might uncover the spoilated evidence.  Multifeeder objects that the system has been dismantled (specifically, the Domino components have been removed) and argues that there is little reason to expect British representatives to be newly forthcoming in further depositions.

_____

(Footnote continued.)

damages – including consequential damages – in the seven figures.  As to the Court's appointment of CFS, following the Court's order that the parties submit joint or competing electronic discovery proposals, Multifeeder proposed CFS, and British proposed that it be permitted to conduct its own search.  The Court appointed the only expert that the parties proposed, namely CFS.  That is, Multifeeder is not uniquely responsible for some portion of CFS's expenses solely by virtue of its having proposed appointment of CFS to the Magistrate Judge.  The Court has taken these considerations into account in crafting the sanctions award discussed below.

Multifeeder also objects to the R&R's reference to its prior contract with CFS in paragraph four of the recommendation.  British does not object.  Because the Court finds reference to Multifeeder's prior contract with CFS to be unnecessary, that reference will be stricken.  More fundamentally, the R&R is plain that it does not purport to decide the rights between Multifeeder and CFS under any prior agreement between those entities. (R&R at 52 n.25.)  To be absolutely clear, however, Multifeeder and CFS's history of doing business together is relevant to the extent such dealings rendered Multifeeder aware of CFS's cost and fee structure.  But the prior CFS-Multifeeder agreement is otherwise irrelevant; indeed, the ESI Protocol Order forbade CFS from conducting business for either Multifeeder or British other than as articulated in the Order.

British responds that Multifeeder possesses a video showing the machine in operation, which undermines the notion that the machine cannot be assessed without the spoliated evidence.  British also offers testimony from a data-recovery company called RonComp, which attempted to recover the files deleted from David Connolly's computer and only recovered personal images and videos.  (Decl. of Daniel RonQuillo, ¶¶ 1-2, May 25, 2012, Docket No. 168.) The company was unable to recover all deleted files, however. (*Id.*)

The Court is not equipped to determine whether the as-yet undiscovered video would allow the parties to assess the machine's operation.  On this record, the Court can only conclude that because the system undisputedly has been dismantled, Multifeeder's prejudice in being deprived of the spoliated evidence cannot be mitigated through a physical inspection of the machine's operation.  The Report is hereby modified accordingly.  Moreover, as discussed more completely above, British's argument that Multifeeder is not prejudiced by the deletions because no evidence shows that relevant files were deleted is singularly unpersuasive.  The Court will adopt without change, however, the Magistrate Judge's finding that Multifeeder's prejudice can be mitigated to some extent through further depositions of British personnel.  The Court will not assume that British personnel will be uncooperative in depositions; indeed, anything less than sterling cooperation from British will not be tolerated.

### 1.    The Sanction Award

A sanction award must "pay the reasonable expenses, including attorney's fees, caused by the failure [to obey an order] . . . ." Fed. R. Civ. P. 37(b)(2)(C).   The Magistrate Judge recommended that $475,000 represents reasonable expenses because that amount "encompasses much of CFS's current unpaid invoices, some past paid amounts by Multifeeder to CFS, and reasonable legal fees and costs for litigating this discovery debacle." (R&R at 50.)  Multifeeder objects that this figure does not cover its reasonable expenses.   Since the April 26, 2011 ESI Order, CFS alone has incurred $478,355.78 in fees, of which Multifeeder has already paid a portion.  (Aff. of Neal F. Nordling, ¶ 4, May 11, 2012, Docket No. 161-2.)[7]  In addition, Multifeeder alleges that it has incurred no less than $176,607.21 in costs and fees in connection with seeking and enforcing the ESI Order.  (*See* Aff. of Kristin L. Kingsbury ¶ 7, May 11, 2012, Docket No. 161-3 (calculating fees incurred to seek appointment of a computer forensic expert, to compile a stipulated discovery protocol, and other costs related to the ESI Order, but excluding all fees and costs associated with ordinary discovery and litigation activity).)  Accordingly, Multifeeder asks that the recommended $500,000 sanction be raised to

---

[7] Pursuant to the Court's Third Case Management Order, the parties have been submitting by affidavit further CFS invoices beyond this amount, apparently for data storage, as they are received. (*See e.g.*, Aff. of Kristin L. Kingsbury, Aug. 10, 2012, Docket No. 177.)

$692,131.74 – reflecting $490,524.53 paid or outstanding to CFS,[8] the $176,607.21 in attorneys' fees and costs, and a payment of $25,000 to the Court.[9]

The Court finds that British must bear the vast bulk of these expenses and that the recommended $475,000 sanction is insufficient for several reasons. First, the recommended sanction was rooted in the Magistrate Judge's finding that CFS's unpaid invoices as of the time of the R&R totaled $288,910.12. (R&R at 31.) It is now undisputed that CFS's current unpaid fees amount to more than $320,033.84, and fees for data storage continue to accumulate. (*E.g.*, Aff. of Kristin L. Kingsbury, July 27, 2012, Docket No. 175.) Moreover, Multifeeder has already paid CFS at least $158,321.96 since the ESI Order. (Nordling Aff. ¶ 4.) While CFS's fees are significant, neither party has articulated a basis on which the Court might conclude that the fees are unreasonable in light of the extensive work it performed. Absent such a reason the Court will not unilaterally reduce the fees of its appointed third-party expert.

Second, the Court finds that given the more than $490,524.53 paid or outstanding to CFS, $475,000 is insufficient to compensate Multifeeder for the considerable

---

[8] This figure includes $320,033.82 in outstanding CFS invoices, the $6,168.75 incurred prior to the ESI Order to advise about and engage in the meet-and-confer sessions with British, the $158,321.96 that Multifeeder paid to CFS pursuant to the ESI Order, and $6,000 that Multifeeder remitted to CFS to take its subpoenaed deposition in February 2012. (*See* Aff. of Kristin L. Kingsbury, ¶ 4, Exs. 1, 2, May 11, 2012, Docket No. 161-3 (summing CFS's total claimed unpaid amounts to $320,033.82).)

[9] British responds generally that the $475,000 is more than necessary to cover Multifeeder's "reasonable" expenses because Multifeeder is responsible for some portion of CFS's ballooning expenses; it does not comment directly on the $176,607.21 that Multifeeder claims to have expended in attorneys' fees.

attorneys' fees it has incurred in connection with British's abusive discovery behavior. *See* Fed. R. Civ. P. 37(b)(2)(C) (sanction award must include reasonable attorneys' fees). British does not dispute the $176,607.21 that Multifeeder claims to have expended in seeking and enforcing the ESI Order, and the Court finds that amount to be credible.[10]

Third, even after considering that Multifeeder's prejudice may be mitigated to some extent by the availability of British personnel for further depositions, and that Multifeeder might have avoided some expense had it sought the Court's intervention as soon as it realized CFS's costs were exploding far beyond its estimate (even if a result of British's unexpectedly abusive conduct), the Court finds that a sanction of $600,000 is warranted under the circumstances. Multifeeder has suffered significant prejudice as a result of British's spoliation of evidence. Neither the Court nor Multifeeder will ever know what information Blair Connolly and David Connolly, Jr. destroyed and adjudication of this discovery dispute has delayed resolution of the case and vastly increased Multifeeder's expenses. Indeed, Multifeeder will likely incur further expenses

---

[10] However, cognizant of the standards for determining reasonable attorneys' fees outside the Rule 37 context, *see, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (interpreting 42 U.S.C. § 1988); *Zoll v. E. Allamakee Cmty. Sch. Dist.*, 588 F.2d 246, 252 n.11 (8th Cir. 1978) (enumerating factors to consider in calculating a reasonable fee), the Court finds that without a more particularized accounting than appears in the Kingsbury affidavit, it cannot find that the $176,607.21 is a reasonable fee. *Compare Henry v. Gill Indus., Inc.*, 983 F.2d 943, 946 (8th Cir. 1993) (holding that an affidavit of counsel disclosing nature of services rendered, the amount of attorney time expended, and the hourly rates billed to client provided sufficient evidentiary basis to determine reasonableness of fees) *with Kamps v. Fried, Frank, Harris, Shriver & Jacobson LLP*, 274 F.R.D. 115, 119 (S.D.N.Y. 2011) (limiting fee award where counsel did not provide adequate documentation including hours worked). While the sanction imposed by the Court does not embrace the entire $176,607.21 Multifeeder spent as a result of British's discovery violations because it also encompasses CFS's substantial fees, the Court will nonetheless order Multifeeder to submit a more detailed accounting of that sum within 30 days of this Order, and may adjust the sanction award should it determine any portion of this amount to be unreasonable.

in deposing British personnel about the very issues being litigated in this motion. The Court has also considered that this is not the first sanctions order in this case; British's repeated violations of the Court's discovery orders warrant significant sanctions to deter British from further misconduct. Therefore, the Court finds that a sanction of $600,000 represents reasonable expenses and attorneys' fees because it encompasses much of CFS's current unpaid invoices, at least some past paid amounts by Multifeeder to CFS, and reasonable legal fees and expenses in litigating this discovery dispute. The Court finds that this amount is adequate to ameliorate the prejudice British has caused to Multifeeder and to secure British's compliance with the Court's future orders.

## 2.    Multifeeder's Payment of Fees Directly to CFS

Multifeeder also objects to the recommendation that it directly pay CFS the outstanding amounts owed to it. Multifeeder avers that if it is ordered to pay CFS without first receiving British's court-ordered payment, it will be forced to go out of business. (Nordling Aff. ¶ 2.) British argues that this request is without merit and that requiring direct payment to CFS is appropriate and consistent with the Court's factual findings.

The ESI Protocol Order requires Multifeeder to pay "[a]ll costs reasonably incurred by CFS in the implementation of this protocol that have not otherwise been designated as the responsibility of British Confectionery," (ESI Protocol Order ¶ 12), and the Court is loath to modify the carefully-crafted order to require British to directly pay CFS a portion of the sanctions award. However, the Court agrees with Multifeeder that

ordering simultaneous payment from British to Multifeeder and Multifeeder to CFS would – given Multifeeder's financial condition – operate as a sanction against it in the event that British fails to timely pay the sanctions award. To ameliorate this problem, the Court will order several staggered payments.

British will pay Multifeeder half of the sanctions award, $300,000, within 90 days of the date of this Order. The second half of the sanctions award will be payable no later than 120 days of the date of this Order. Per the ESI Protocol Order, Multifeeder will be ordered to pay all outstanding CFS fees and expenses within 120 days of the date of this Order. Staggered payments will provide Multifeeder with the security of receiving enough funds to satisfy the bulk of CFS's fees before it is under a court-imposed obligation to pay those fees, and, should British falter in making payment, enough time to seek whatever relief Multifeeder deems necessary before its obligation becomes due. The Court will not order that Multifeeder's payment to CFS only comes due when Multifeeder receives the sanction from British because a wholesale shifting of the risk of nonpayment to the Court-appointed expert is inappropriate. CFS has expended considerable time and resources in complying with this Court's orders, and its fees must be paid.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, the Court **SUSTAINS in part** and **OVERRULES in part** plaintiff's and defendant British Confectionery Company's objections [Docket No. 159, 163] and **ADOPTS in part** and

**REJECTS in part** the Report and Recommendation of the Magistrate Judge dated April 26, 2012 [Docket No. 152].  **IT IS HEREBY ORDERED** that:

1.     Plaintiff Multifeeder Technology, Inc. submit to the Court a more detailed accounting of the $176,607.21 than provided in the May 11, 2012 Kingsbury affidavit, including, at a minimum, number of hours worked, attorneys' hourly rates, and description of work performed.  Multifeeder must provide this accounting within thirty (30) days of date of this Order.

2.     Plaintiff Multifeeder Technology, Inc.'s (Second) Motion for Sanctions [Docket No. 104] is **GRANTED in part** and **DENIED in part** as follows:

  a.     Defendant British Confectionery Company Limited is held in civil contempt under Fed. R. Civ. P. 37(b)(2)(A)(vii).

  b.     Defendant British Confectionery Company Limited is ordered to remit the sum of Twenty-Five Thousand Dollars ($25,000.00) to the Clerk of Court, 202 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55455, as a sanction for the abuse of the Court's processes.  This amount is to be due and payable in full within ninety (90) days of the date of this Order.

  c.     Defendant British Confectionery Company Limited is directed to pay plaintiff Multifeeder Technology, Inc. $600,000, as follows:

    i.     Half of the award, $300,000, is due and payable within ninety (90) days of the date of this Order.

ii.      Half of the award, $300,000 is due and payable within one-hundred twenty (120) days of the date of this Order.

d.      Plaintiff's motion is denied in all other respects.

3.      The attachments to the Case Management Order [Docket No. 142] are hereby **UNSEALED**.

a.      Defendant British Confectionery Company Limited's Objection to the Unsealing of the Compact Disc Accompanying Attachment #4 [Docket No. 144] is **OVERRULED as moot** because Case Management Order [Docket No. 142] did not include the compact disc as an attachment.

4.      Plaintiff Multifeeder Technology, Inc. is ordered to pay to Computer Forensic Services, Inc. ("CFS"), within one-hundred twenty (120) days of the date of this Order, all unpaid invoices to date pursuant to the ESI Protocol Order [Docket No. 84].

5.      Computer Forensic Services ("CFS") is directed to:

a.      Immediately cease all billable activity in this matter unless such billing is permitted under Fed. R. Civ. P. 45.

b.      To the extent that CFS has not done so already, within seven (7) days of the date of this Order, CFS shall provide to British's local counsel an electronic copy of the detailed log from Paragraph 10 of the ESI Protocol Order [Docket No. 84] and a copy of the compact disc attached to the Court's copy of the Forensic Services Report, dated August 12, 2012.

c.      Within seven (7) days of the date of this Order, CFS shall deliver to the chambers of United States Magistrate Judge Tony N. Leung, Warren E. Burger Federal Building and U.S. Courthouse, 316 N. Robert Street, Suite 342, St. Paul, MN 55101, the original hard drives containing the recreated copies of each custodian's personal computers, identified as System Numbers 001 through 012 in the Forensic Services Report, dated August 12, 2012.

d.      After completing the aforementioned tasks, CFS shall wipe its systems of all data in its possession from this action that it would not otherwise keep in the ordinary course of business.

DATED:  September 18, 2012
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge